IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTERNATIONAL PENSION FUND, <br><br> and <br><br> TRUSTEES OF THE BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTERNATIONAL PENSION FUND, <br><br> Plaintiffs, <br><br> v. <br><br> JUST BORN II, INC. dba GOLDENBERG CANDY COMPANY <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 8:16-cv-00793-DKC |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS ON LIABILITY**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

STATEMENT OF THE CASE........................................................................................1

    A.      The Parties.......................................................................................1

    B.      The Relevant Statutory Background and Framework ..............................................2

    C.      The Undisputed Material Facts Established By the Pleadings................................5

    D.      The Fund's Claim and the Employer's Answer......................................................7

ARGUMENT ...................................................................................................................8

I.      ON THE UNDISPUTED FACTS OF RECORD, THE FUND CLEARLY HAS STATED A VALID ERISA CLAIM AGAINST THE EMPLOYER.......................9

II.     NONE OF THE EMPLOYER'S "AFFIRMATIVE DEFENSES" IS A LEGALLY TENABLE DEFENSE ...................................................................................11

    A.      The Employer's First Set of Affirmative Defenses ................................................13

    B.      The Employer's Second Set of Affirmative Defenses ..........................................18

III.    THE SPECIFIC RELIEF TO WHICH THE FUND IS ENTITLED..................................31

CONCLUSION................................................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Agathos v. Starlite Motel,* 977 F.2d 1500 (3d Cir. 1992) ............................................................. 21

*Aguilar v. City Lights of China Rest., Inc.,* No. DKC 11-2416,
    2011 WL 5118325 (D. Md. Oct. 24, 2011) ........................................................ 12, 30

*Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund,*
    971 F.2d 1346 (7th Cir. 1992) ........................................................................ 26, 27

*Ashcraft v. Iqbal,* 556 U.S. 662 (2009) ........................................................................... 12

*Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v.*
    *New Bakery Co.,* 133 F.3d 955 (6th Cir. 1998) .................................................... 2

*Bakery & Confectionery Union & Indus. Int'l Pension Fund v. New World Pasta Co.,*
    309 F. Supp. 2d 716 (D. Md. 2004) ............................................................... 1, 2, 5

*Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,*
    118 F.3d 1018 (4th Cir. 1997) ........................................................................ 1, 21

*Barry v. EMC Mortg.,* No. DKC 10-3120, 2011 WL 4352104 (D. Md. Sept. 15, 2011) ....... 12, 13

*Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) ........................................................... 12

*Bell Atlantic-Maryland, Inc. v. Prince George's Cty.,* 155 F. Supp. 2d 465 (D. Md. 2001) .......... 8

*Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310 (2d Cir. 1990) .............................. 21

*Board of Trustees, Michigan United Food & Commercial Workers Union v.*
    *Eberhard Foods, Inc.,* 831 F.2d 1258 (6th Cir. 1987) ............................................. 26

*Bragdon v. Abbott,* 524 U.S. 624 (1998) ..................................................................... 26

*Central States, SE & SW Areas Pension Fund v. Gerber Truck Serv.,*
    870 F.2d 1148 (7th Cir. 1989) ....................................................................... 2, 5

*Combs v. Classic Coal Corp.,* 931 F.2d 96 (D.C. Cir. 1991) ............................................. 26, 27

*Connell Constr. Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616 (1975) ...................... 18

*Construction Indus. Laborers, Pension Fund v. Wellington Concrete LLC,*
    No. 15-804, 2016 WL 3021586 (D. Mo. March 31, 2016) ........................................ 21

*Dairy v. Dairy Employees Union Local No. 17,* No. 13-1112,  2015 U.S. Dist.
   LEXIS 171875 (E.D. Cal. Dec. 23, 2015) ........................................................ 23, 24, 26

*Duckett v. Fuller,* 819 F.3d 740 (4th Cir. 2016) .......................................................... 16

*EC Term of Years Tr. v. United States,* 550 U.S. 429 (2007) ....................................... 15

*Geoghegan v. Grant,* No. DKC 10-1137, 2011 WL 673779 (D. Md. Feb. 17, 2011) ................... 8

*Haley Paint Co. v. E.I. Du Pont De Nemours & Co.,* 279 F.R.D. 331 (D. Md. 2012) ........... 11, 13

*Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776 (4th Cir.1999) ............................ 30

*In re Hostess Brands, Inc.,* 499 B.R. 406 (S.D.N.Y. 2013) ........................................... 30

*In re Mabbott,* 255 B.R. 787 (Bankr. M.D. Fla. 2000) ................................................. 8

*Laborers Health & Welfare Tr. Fund v. Advanced Lightweight Concrete Co.,*
   484 U.S. 539 (1988) ................................................................................... 15

*Long v. Welch & Rushe, Inc.,* 28 F. Supp. 3d 446 (D. Md. 2014) .................................... 12

*Martin v. Garman Constr. Co.,* 945 F.2d 1000 (7th Cir. 1991) ...................................... 17

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71 (2006) ........................... 26

*Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134 (1985) ........................................... 23

*Nw. Airlines v. Transp. Workers Union,* 451 U.S. 77 (1981) ....................................... 23

*Trs. of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.,* 692 F.3d 127 (2d Cir. 2012) ...... 2

*Voice Age Corp. v. RealNetworks, Inc.,* 926 F. Supp. 2d 524 (S.D.N.Y. 2013) ...................... 8

*Weidman v. Exxon Mobil Corp.,* 776 F.3d 214 (4th Cir. 2015) ...................................... 30

*West Virginia CWP Fund v. Stacy,* 671 F.3d 378 (4th Cir. 2011) ................................... 15

*Yates v. Municipal Mortg. & Equity, LLC,* 744 F.3d 874 (4th Cir. 2014) ............................ 7

## STATUTES AND RULES

29 U.S.C. § 186(c)(5)(B) ................................................................................... 3

29 U.S.C. §§ 1001 *et seq.* ................................................................................ 1

29 U.S.C. § 1002(16)(B)(iii) ................................................................................... 3

29 U.S.C. § 1021(f)(1)(B)(v) ................................................................................ 23

29 U.S.C. § 1021(k) ............................................................................................. 24

29 U.S.C. § 1021(k)(1)(K) ................................................................................... 23

29 U.S.C. § 1024(b)(4) ........................................................................................ 24

29 U.S.C. § 1024(d) ............................................................................................ 24

29 U.S.C. § 1032(g)(2) .......................................................................................... 8

29 U.S.C. § 1085(a)(2) ........................................................................................... 3

29 U.S.C. § 1085(b)(3) ........................................................................................ 3, 9

29 U.S.C. § 1085(b)(3)(A) ................................................................................... 24

29 U.S.C. § 1085(b)(3)(B)(i) ............................................................................ 3, 26

29 U.S.C. § 1085(b)(3)(B)(iii) ..................................................................... 3, 24, 26

29 U.S.C. § 1085(b)(3)(D) ............................................................................... 7, 24

29 U.S.C. § 1085(b)(6) .......................................................................................... 7

29 U.S.C. § 1085(e)(1)(B) .................................................................................. 3, 4

29 U.S.C. § 1085(e)(3)(C)(i)(II) ............................................................................. 4

29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) ................................................................. *passim*

29 U.S.C. § 1085(e)(3)(C)(iv) ................................................................................ 5

29 U.S.C. § 1085(e)(7) ........................................................................................ 22

29 U.S.C. § 1132(a)(3) ........................................................................................... 5

29 U.S.C. § 1132(a)(5) ........................................................................................ 24

29 U.S.C. § 1132(a)(8) ........................................................................................ 23

29 U.S.C. § 1132(a)(10) ...................................................................................... 22

29 U.S.C. § 1132(a)(11) ................................................................................................. 23

29 U.S.C. § 1132(g)(2) .............................................................................................. 5, 10

29 U.S.C. § 1145 ....................................................................................................... 5, 19

Fed. R. Civ. P. 9(b) ......................................................................................................... 30

## OTHER AUTHORITIES

5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
    § 1297 (2d ed.1990) .................................................................................................... 30

S. Comm. on Labor & Human Res., 96th Cong., 2d Sess. (Comm. Print 1980) ......................... 21

SOCIETY OF ACTUARIES, THE RP-2000 MORTALITY TABLES, EXECUTIVE SUMMARY,
    *available at* https://www.soa.org/Files/Research/Exp-Study/rp00_mortalitytables.pdf. .......... 28

Plaintiff Bakery & Confectionery Union and Industry International Pension Fund

("Pension Fund") and its Trustees (collectively, "the Fund") have brought this action under the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, to establish

the liability of the Defendant (Just Born II, Inc. dba Goldenberg Candy Company) ("the

Employer") to make certain contributions to the Pension Fund, and to recover those contributions

and other ancillary monetary relief required by ERISA in such an action.  As set out below,

because the Employer does not dispute the factual allegations in the Complaint that suffice to

establish the legal validity of the Fund's ERISA claim, and because none of the Employer's

asserted affirmative defenses to that ERISA claim are legally tenable defenses, the Fund is

entitled to judgment on the pleadings on liability (specifically, to a declaratory judgment that the

Employer is legally obligated to make the contributions at issue).

## STATEMENT OF THE CASE

### A.     The Parties

The Pension Fund is a nationwide multiemployer defined-benefit pension fund that

provides retirement benefits to employees working in the baking and candy industries under

collective bargaining agreements between employers and local unions.  *See Bakery &*

*Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1022

(4th Cir. 1997); *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. New World Pasta*

*Co.*, 309 F. Supp. 2d 716, 719 (D. Md. 2004).  The employers make contributions to the Pension

Fund at rates set by those agreements, and the Pension Fund becomes obligated to pay pension

benefits to the employees covered by those agreements.  The Fund has long required all

participating employers to agree to standard contribution terms, and to make contributions on

behalf of all employees covered by the collective bargaining agreements, so that employers

cannot effectively reduce their contribution rates (to the detriment of the Fund or other participating employers) by carving out particular groups of employees.  Complaint (Dkt. No. 1) ("Compl.") ¶ 14; *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co.,* 133 F.3d 955, 956-58, 959 n.4 (6th Cir. 1998), quoting *Central States, SE & SW Areas Pension Fund v. Gerber Truck Serv.,* 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc); *New World Pasta,* 309 F. Supp. 2d at 723 & n.5, 725.

The Employer is a candy company that makes Goldenberg's Peanut Chews®.  Compl. ¶ 8; Answer (Dkt. No. 8) ¶ 8.  Its most recent collective bargaining agreement, in effect from March 1, 2012 through February 28, 2015 (later extended through April 30, 2015), required contributions to the Fund on behalf of "all" employees "working in a job classification covered by the Collective Bargaining Agreement"; "there are no exceptions for employees who are not members of the Union, temporary, seasonal, or part-time employees, for leased employees, or for any other type of employee."  Compl. ¶¶ 10, 13 & Exh. A, Art. 22, p. 16 ¶ 2; Answer ¶ 10.  The present dispute concerns the Employer's attempt to carve newly hired employees out of that contribution requirement.  Compl. ¶¶ 19-20, 22; Answer ¶¶ 19-20, 22.

## B.     The Relevant Statutory Background and Framework

Against the backdrop of widespread underfunding of multiemployer pension plans, Congress in 2006 enacted the Pension Protection Act ("PPA"), which amended ERISA to include "a number of mechanisms aimed at stabilizing pension plans and ensuring that they remain solvent."  *Trs. of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 130 (2d Cir. 2012).  Among these mechanisms is an annual certification process in which a multiemployer pension plan's actuary assesses the financial health of the pension plan and, if the plan fails to meet certain criteria specified in the PPA, issues a certification to the Secretary of

the Treasury and to the pension plan sponsor (here, the Pension Fund's Board of Trustees) that

the plan is in "endangered," "seriously endangered," or "critical" status.  *See* 29 U.S.C.

§ 1085(b)(3).

In conducting this annual certification process, a pension plan's actuary must make and

apply certain projections regarding the pension plan's assets and liabilities "based on reasonable

actuarial estimates, assumptions, and methods that"—with one exception—"offer the actuary's

best estimate of anticipated experience under the plan."  29 U.S.C. § 1085(b)(3)(B)(i).  The one

exception is that "[a]ny [actuarial] projection of activity in the industry or industries covered by

the plan, including future covered employment and contribution levels, shall be based on

information provided by the plan sponsor, which shall act reasonably and in good faith."  29

U.S.C. § 1085(b)(3)(B)(iii).[1]

If, after making these projections, a pension plan's actuary determines that the pension

plan is in "critical" status and certifies the pension plan as such (as happened here, *see infra*), the

plan sponsor is required by statute to develop a "rehabilitation plan" aimed at improving the

pension plan's funding and averting insolvency.  29 U.S.C. § 1085(a)(2).  This rehabilitation

plan must include "reductions in future benefit accruals and adjustable benefits, and increases in

contributions, that the plan sponsor determines are reasonably necessary to emerge from critical

status."  29 U.S.C. § 1085(e)(1)(B).  After the plan sponsor adopts a rehabilitation plan, it must

provide each participating employer and its counterpart union (hereinafter, "the bargaining

parties") with one or more contribution schedules that "show[] revised benefit structures, revised

contribution structures, or both, which, if adopted, may reasonably be expected to enable the

---

[1] The "plan sponsor" of a multiemployer plan is the board of trustees, which by law must provide
equal representation for the contributing employers and the sponsoring union.  *See* 29 U.S.C.
§ 186(c)(5)(B); § 1002(16)(B)(iii).

multiemployer plan to emerge from critical status in accordance with the rehabilitation plan."  29

U.S.C. § 1085(e)(1)(B).  The bargaining parties must then agree to adopt one of the contribution

schedules proposed by the plan sponsor, and if they fail to do so within 180 days after the

collective bargaining agreement expires, the plan sponsor must impose on the parties a "default"

schedule that requires certain benefit reductions and contribution rate increases.  29 U.S.C.

§ 1085(e)(3)(C)(i)(II).

      In 2014, Congress again addressed the underfunding crisis in multiemployer pension

plans through the Multiemployer Pension Reform Act of 2014 ("MPRA"), which further

amended ERISA to provide, in pertinent part:

> If a collective bargaining agreement providing for contributions
> under a multiemployer plan in accordance with a schedule provided
> by the plan sponsor pursuant to a rehabilitation plan . . . expires while
> the plan is still in critical status, and after receiving one or
> more updated schedules from the plan sponsor . . . , the bargaining
> parties with respect to such agreement fail to adopt a contribution
> schedule with terms consistent with the updated rehabilitation plan
> and a schedule from the plan sponsor, then the contribution schedule
> applicable under the expired collective bargaining agreement, as
> updated and in effect on the date the collective bargaining agreement
> expires, *shall be implemented by the plan sponsor* [effective 180 days
> after the date on which the collective bargaining agreement expired].

29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) (emphasis added).  In other words, if the collective bargaining

agreement that adopted a contribution schedule pursuant to a rehabilitation plan expires while the

pension plan remains in critical status, and the bargaining parties fail to reach a new agreement

within 180 days containing terms consistent with one of the rehabilitation plan's contribution

schedules, the pension plan sponsor is *required* by 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) to impose

on the bargaining parties the contribution schedule from the expired agreement, in derogation of

any collective bargaining rights the parties might otherwise have had under labor law with

respect to the employer's level of contributions to the pension plan.

If a participating employer then fails to make contributions to the pension plan in accordance with this *statutorily-imposed* contribution schedule, such failure "shall be treated as a delinquent contribution under [section 515 of ERISA] and shall be enforceable as such."  29 U.S.C. § 1085(e)(3)(C)(iv).  Section 515 provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."  29 U.S.C. § 1145.  An employer's contribution obligations to a multiemployer pension plan under section 515 are enforceable in an ERISA section 502(a)(3) action by the plan's trustees for appropriate equitable and monetary relief, *see* 29 U.S.C. § 1132(a)(3), and that monetary relief "shall" include the unpaid contributions, interest on the unpaid contributions, liquidated damages and reasonable attorneys' fees and costs, *see* 29 U.S.C. § 1132(g)(2); *Gerber Truck Co.,* 870 F.2d at 1156; *New World Pasta*, 309 F. Supp. 2d at 731.  This is such an ERISA action brought to enforce the Employer's contribution obligations under section 515.

### C.  The Undisputed Material Facts Established By the Pleadings

The Fund's Complaint sets out the following material facts in support of its ERISA claim for contributions to the Pension Fund, all of which are undisputed in the Employer's Answer to the Complaint.[2]

*First*, the Employer is a participating employer in the Pension Fund pursuant to a series of collective bargaining agreements between the Employer and the Bakery, Confectionery, and Tobacco Workers International Union, Local Union 6 ("Local 6"), the most recent of which, as

---

[2] The Employer admits some of these material facts in its Answer, and fails to dispute others—often stating in the latter regard that an Exhibit to the Complaint setting out certain facts "speaks for itself."  For present purposes, this is a distinction without a difference.  *See infra* pp. 8-9.

extended, ran from March 1, 2012 through April 30, 2015.  Compl. ¶¶ 10-11, 18 & Exhs. A, D; Answer ¶¶ 10-11, 18.

*Second*, in 2012, during the term of that collective bargaining agreement, the Pension Fund's actuary certified that the Fund was in critical status.  Compl. ¶ 15; Answer ¶ 15.

*Third*, following the actuary's critical status certification, the Pension Fund Trustees adopted a rehabilitation plan and provided the Employer and Local 6 with two alternate contribution schedules (a "Preferred Schedule" and a "default" schedule) under that rehabilitation plan.  Compl. ¶ 16 & Exh. B; Answer ¶ 16.

*Fourth*, the Employer and Local 6 elected the Preferred Schedule and amended their then-existing collective bargaining agreement to incorporate the terms of that Preferred Schedule.  Compl. ¶ 17 & Exh. C; Answer ¶ 17.

*Fifth*, the Preferred Schedule chosen by the bargaining parties, by its terms, required the Employer to comply with the Pension Fund's uniform employer contribution requirements, including the requirement that participating employers make contributions to the Pension Fund for all employees working in job classifications covered by the applicable collective bargaining agreement.  Compl. ¶ 16 & Exh. B; Answer ¶ 16.

*Sixth*, on November 2, 2015, after the expiration of the parties' collective bargaining agreement on April 30, 2015, the Employer declared that negotiations with Local 6 over a new collective bargaining agreement were at an "impasse" and purported to implement its "best offer" under which the Employer would henceforth make contributions to the Pension Fund only

on behalf of then-current employees and not on behalf of any employees newly hired after that date.  Compl. ¶¶ 18-20; Answer ¶¶ 18-20.[3]

*Seventh*, on November 6, 2015, the Fund notified the Employer and Local 6 that, in accordance with the plan sponsor's statutory obligation under 29 U.S.C § 1085(e)(3)(C)(ii)-(iii), the Preferred Schedule had been imposed on them and that the Employer was obligated to pay contributions to the Pension Fund at the rates provided by that Preferred Schedule for all employees working in job classifications covered by its collective bargaining agreement with Local 6, with no exception for newly hired employees.  Compl. ¶ 21 & Exh. E; Answer ¶ 21.

*Eighth*, from November 2015 onward, the Employer has not paid contributions to the Pension Fund for newly hired employees in the bargaining unit.  Compl. ¶ 22; Answer ¶ 22.

### D.    The Fund's Claim and the Employer's Answer

The Complaint asserts, based on the foregoing material facts, that the Employer's failure and refusal to make contributions to the Pension Fund on behalf of newly hired employees is "a breach of [the Employer's] obligation under the Preferred Schedule, which was lawfully implemented by the Pension Fund as required by 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii)," *see* Compl. ¶ 25, and that plaintiffs are entitled under ERISA to recover those unpaid contributions together

---

[3] The Complaint does not specifically allege that the Pension Fund was still in critical status when the collective bargaining agreement expired on April 30, 2015.  However, this Court can take judicial notice of that fact from a notice provided by the Fund to the Secretary of Labor on April 30, 2015, as required by law, *see* 29 U.S.C. § 1085(b)(3)(D), advising the Secretary that the Pension Fund was still in critical status (indeed, in critical *and declining* status) for the plan year beginning on January 1, 2015.  *See Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014) (noting that the courts may properly take judicial notice of "relevant SEC filings" and "other publicly available documents").  This legally-required notice to the Secretary of Labor is available on the Labor Department's website at https://www.dol.gov/ebsa/pdf/c-notice051815002.pdf.

"Critical and declining status" is a subcategory of "critical status" that was created as part of the 2014 amendments to the PPA described *supra* pp. 4-5.  *See* 29 U.S.C. § 1085(b)(6).

with the ancillary monetary relief that ERISA requires in such cases, *see id.* ¶¶ 26-27; 29 U.S.C. § 1032(g)(2).  Although, as noted, the Employer does *not* dispute *any* of the material facts on which the Fund's ERISA claim rests, the Employer denies that claim.  *See* Answer ¶¶ 25-27.

In addition to denying the Fund's ERISA claim, the Employer interposes nine separately-numbered "affirmative defenses."  *See* Answer, pp. 15-16; *see also id.* ¶¶ 28-54 (setting out various allegations "relevant to defendant's affirmative defenses").  Rather than describe each of these nine "affirmative defenses" here, we describe them in the legal argument that follows, in which we show that *none* of them is a legally tenable defense to the Fund's ERISA claim.

## ARGUMENT

On a plaintiff's Rule 12(c) motion for judgment on the pleadings, the plaintiff bears the burden of showing:  (1) that it has stated a valid claim for relief against the defendant on the undisputed facts established by the pleadings; and (2) that the defendant, in its responsive pleading, has failed to assert any "legally tenable" affirmative defenses to that claim.  *See In re Mabbott*, 255 B.R. 787, 788-89 (Bankr. M.D. Fla. 2000) (applying Rule 7102 of the Federal Bankruptcy Code, which expressly incorporates Rule 12(c) into federal bankuptcy practice).[4]

Thus, as this Court's decision in *Geoghegan v. Grant*, No. DKC 10-1137, 2011 WL 673779 (D. Md. Feb. 17, 2011) makes clear, a plaintiff's Rule 12(c) motion for judgment on the pleadings is subject to disposition by the court under the "identical" legal standard as a plaintiff's

---

[4] *See also generally Voice Age Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 525, 530-32 (S.D.N.Y. 2013) (stating that Rule 12(c) motions "are an underutilized tool for litigants whose claims are amenable to immediate resolution," and granting the plaintiff's Rule 12(c) motion on the ground that the plaintiff's contract breach claim was supported by unambiguous contract language and none of the defendant's affirmative defenses was legally sufficient to defeat that claim); *Bell Atlantic-Maryland, Inc. v. Prince George's Cty.*, 155 F. Supp. 2d 465, 473 (D. Md. 2001) ("Because the parties do not disagree about any material facts and the outcome depends upon pure questions of law, judgment on the pleadings is appropriate.").

Rule 56 motion for summary judgment, with the only relevant distinction between the two plaintiff's motions being "that the court may not consider facts outside the pleadings under Rule 12(c)." *Id.* at *3.

In **Part I** below, we show that on the undisputed facts established by the pleadings, the Fund has stated a valid ERISA claim against the Employer for contributions to the Pension Fund. And, in **Part II** below, we show that none of the Employer's nine "affirmative defenses" to that ERISA claim is a legally tenable defense.  Based on these showings, the Fund's Rule 12(c) motion for judgment on the pleadings on liability should be granted.

I.      **ON THE UNDISPUTED FACTS OF RECORD, THE FUND CLEARLY HAS STATED A VALID ERISA CLAIM AGAINST THE EMPLOYER**

The recently-enacted ERISA provisions relevant to the Fund's ERISA claim against the Employer for contributions, set out in detail *supra* pp. 2-5, admit of no ambiguity insofar as the Employer's liability to make those contributions is concerned.

Under these recently-enacted ERISA provisions, when a multiemployer pension plan has been certified by the plan's actuary as being in critical status pursuant to 29 U.S.C. § 1085(b)(3); and when a participating employer and its counterpart union have thereafter entered into a collective bargaining agreement obligating the employer to make contributions to the pension plan under a contribution schedule adopted by the plan sponsor under a rehabilitation plan; the employer and the union no longer have complete bargaining freedom when their collective bargaining agreement expires.  If the pension plan remains in critical status when the collective bargaining agreement expires, and after 180 days the bargaining parties fail to reach a new agreement providing for contributions to the pension plan on terms consistent with one of the rehabilitation plan's contribution schedules, the plan sponsor is *required* by 29 U.S.C. §1085(e)(3)(C)(ii)-(iii) to impose on the bargaining parties the contribution schedule from the

expired agreement.  And, if the employer then fails to make contributions to the pension plan in accordance with this *statutorily-imposed* contribution schedule, the trustees are entitled to bring an ERISA action to collect the unpaid contributions, plus appropriate equitable and ancillary monetary relief.

In this case, it is undisputed that the Pension Fund's actuary certified the Fund as being in critical status in 2012; that the Employer and Local 6 thereafter agreed upon a new contribution schedule (the Preferred Schedule) that had been adopted by the Trustees under a rehabilitation plan and amended their then-existing collective bargaining agreement accordingly; and that 180 days after the agreement's expiration, with the Pension Fund still in critical status as of the expiration date, the Employer and Local 6 failed to reach a new collective bargaining agreement. Instead, the Employer implemented its "best offer"—inconsistent with the Preferred Schedule terms requiring contributions for all employees working in the bargaining unit—under which the Employer would not make contributions to the Pension Fund on behalf of employees that were newly hired after November 2, 2015.  *Supra* pp. 5-7.

Given these undisputed facts, it follows *as a matter of law* that:  (A) the Pension Fund Trustees were required by 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) to impose the Preferred Schedule on the bargaining parties, thus obligating the Employer to continue making contributions to the Pension Fund on behalf of all employees working in the Local 6 bargaining unit, without any exception for newly hired employees; and (B) the Trustees have a claim against the Employer to enforce the legal obligation to make these required contributions to the Pension Fund and to recover the ancillary monetary relief specified in 29 U.S.C. § 1132(g)(2).

In short, it is clear that the Fund has met its initial burden on this Rule 12(c) motion to show that on the undisputed facts of record, the Fund has stated a valid claim for relief against the Employer.

## II.    NONE OF THE EMPLOYER'S "AFFIRMATIVE DEFENSES" IS A LEGALLY TENABLE DEFENSE

The nub of the matter here, then, is whether any of the nine separately-numbered "affirmative defenses" asserted by the Employer in its responsive pleading is a legally tenable defense.  As we show, the answer to this question plainly is "no."  Before we turn to this showing, however, three introductory points are in order.

*First*, the Employer's **first** "affirmative defense," *see* Answer p. 15, is not genuinely a Rule 8(c) "affirmative defense" at all, but rather an assertion under Rule 12(b)(6) that the Complaint fails to state a claim upon which relief can be granted.  *See Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 337 (D. Md. 2012) ("failure to state a claim" is not an affirmative defense, but rather a defense alleging a defect in the plaintiff's prima facie case).  As shown in **Part I** above, however, the Complaint most certainly does state a claim on which relief can be granted.  Thus, the Employer's **first** "affirmative defense" should be rejected by this Court at the outset, and requires no further discussion below.

*Second*, the eight affirmative defenses that genuinely qualify as such can be grouped into two sets of affirmative defenses based on the allegations in the Employer's responsive pleading on which they rest.  Specifically, the Employer's **second to fourth** affirmative defenses comprise one set of affirmative defenses resting on the allegations in paragraphs 51-54 of the Employer's responsive pleading pertaining to the most recent collective bargaining negotiations between the Employer and Local 6; and the Employer's **fifth to ninth** affirmative defenses comprise a second set of affirmative defenses resting on the allegations in paragraphs 28-49 of

the Employer's responsive pleading relating to the Pension Fund's critical status certification.[5] Our showing that the Employer has failed to assert *any* legally tenable affirmative defenses in this case is thus organized into a subsection "A" and a subsection "B" dealing with the Employer's first and second sets of affirmative defenses, respectively.

*Third*, this Court has held in an unbroken line of decisions that the legal sufficiency of affirmative defenses asserted in a defendant's responsive pleading is to be evaluated under the same standards as the legal sufficiency of the claims asserted in a plaintiff's complaint, *i.e.*, under the by-now-familiar standards defined in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcraft v. Iqbal*, 556 U.S. 662 (2009).  *See Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 461-62 (D. Md. 2014) ("[A]ffirmative defenses must meet the *Twombly* and *Iqbal* standards because defendants should be held to the same pleading standard as plaintiffs . . . .") (internal citations omitted); *Aguilar v. City Lights of China Rest., Inc.*, No. DKC 11-2416, 2011 WL 5118325, at *1-4 (D. Md. Oct. 24, 2011) (same); *Barry v. EMC Mortg.*, No. DKC 10-3120, 2011 WL 4352104, at *2-4 (D. Md. Sept. 15, 2011) (same).  Under these by-now-familiar standards, as applied to affirmative defenses, the defendant's responsive pleading must contain

---

[5] The Employer's **ninth** affirmative defense would also appear to rest in part on the conclusory legal statement in paragraph 50 of its responsive pleading that "Plaintiffs' Rehabilitation Plan and contribution schedules were legally defective, including by their failure to provide notice to plan beneficiaries according to governing statutory requirements."  But the Employer fails to allege any respect in which a failure to provide appropriate notice to *plan beneficiaries* undermines the validity of *its* election of the Preferred Schedule of contribution rates.  And, even if the Employer had standing to complain of a defect in the notice to beneficiaries, this allegation is wholly conclusory and fails to satisfy the applicable pleading standards.  *See infra* pp. 12-13.

sufficient "factual content" (as contrasted with "conclusory legal statements") to make out a plausible (and thus legally tenable) affirmative defense.  *See id.* at *5.[6]

Against this background, we now address the two sets of affirmative defenses asserted by the Employer that genuinely qualify as such, taken in the order in which the Employer enumerates them in its responsive pleading at pp. 15-16.

A.    The Employer's First Set of Affirmative Defenses

As previously noted, the Employer's first set of affirmative defenses (**second to fourth**) rests on the allegations in paragraphs 51-54 of the Employer's responsive pleading pertaining to the 2015 collective bargaining negotiations between the Employer and Local 6.  These three affirmative defenses are all contrary to law.

1.    The Employer's **second** affirmative defense states, in full:

> The Collective Bargaining Agreement and Trust Agreement upon which plaintiffs' claim for relief depends have expired, and upon a bona fide impasse being reached over the terms of a new collective bargaining agreement, defendant was within its rights to implement the final offer it provided to Local 6 during collective bargaining negotiations.

*See* Answer, at p.15; *see also id.* ¶ 53 (noting that under its final offer to Local 6, "defendant would continue to contribute to the Pension Fund for then-current employees, but would contribute exclusively to Local 6's and participating employers' 401k plan on behalf of new employees.").  This **second** affirmative defense is contrary to the explicit terms of the statute.

---

[6] This Court's decisions holding that the *Twombly-Iqbal* standards apply to affirmative defenses all arose in the specific context of a plaintiff's Rule 12(f) motion to strike affirmative defenses. A plaintiff's Rule 12(f) motion to strike affirmative defenses is a "more fitting" procedural mechanism than a plaintiff's Rule 12(c) motion for judgment on the pleadings when the plaintiff challenges the legal sufficiency of "only some" of the affirmative defenses asserted by the defendant.  *Haley Paint Co.*, *supra*, 279 F.R.D. at 335.  Here, however, the Fund challenges the legal sufficiency of *all* of the affirmative defenses asserted by the Employer, making the instant Rule 12(c) motion a "more fitting" procedural mechanism than a Rule 12(f) motion.

As an initial matter, this **second** affirmative defense begins by misstating the underpinnings of the Fund's ERISA claim in this case.  That ERISA claim most certainly does *not* "depend[ ]" on the collective bargaining agreement between the Employer and Local 6 (and the trust agreement incorporated therein) that expired on April 30, 2015.  Rather, that ERISA claim "depends" on the fact that the Employer and Local 6 adopted the Preferred Schedule as part of that collective bargaining agreement, but failed (although the Pension Fund remained in critical status as of April 30, 2015) to reach a new agreement within 180 days of April 30, 2015 on contribution terms consistent with one of the schedules that were part of the rehabilitation plan, at which point the Trustees were *required* by the 2014 MPRA provision set out *supra* p. 4 to impose the Preferred Schedule on the bargaining parties.  In other words, far from "depend[ing]" on a collective bargaining agreement between the Employer and Local 6, the Fund's claim for unpaid contributions "depends" on the bargaining parties' failure to enter into a collective bargaining agreement containing certain terms and on the 2014 MPRA provision that is triggered by such a failure.

This **second** affirmative defense then goes on to assert that, upon reaching a bona fide impasse with Local 6 over the terms of a new collective bargaining agreement, the Employer was "within its rights" to implement a final offer to Local 6 that provided for contributions to the Pension Fund on terms *inconsistent* with those set out in the Preferred Schedule previously elected by the parties under their expired collective bargaining agreement.  That assertion is exactly the opposite of what the statute expressly requires.

To be sure, the National Labor Relations Board ("NLRB") and the courts have held that an employer normally does not violate the National Labor Relations Act of 1934 ("NLRA") if it unilaterally implements terms and conditions of employment that were part of the employer's

14

final best offer to its counterpart union, as long as the employer first reached a bona fide impasse in bargaining with the union.  *See generally Laborers Health & Welfare Tr. Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n.5 (1988).  We may assume that this principle would apply in negotiations between the Employer and Local 6, if Congress had not enacted a specific rule in the 2014 MPRA governing employer-union negotiations over employer contributions to multiemployer pension plans in critical status.

The 2014 MPRA provision relied on by the Fund expressly requires a different result in this particular situation.  In that provision Congress specifically requires that if 180 days have passed after expiration of a collective bargaining agreement that included one of the plan sponsor's schedules, and the employer and the union have not reached agreement on contribution terms that are consistent with that schedule or another schedule adopted by the plan sponsor, the schedule that the employer and union had initially chosen (with any updates) "*shall* be implemented by the plan sponsor."  29 U.S.C. § 1085(e)(3)(C)(ii)-(iii).  This leaves no room for operation of the NLRA precedents that would otherwise allow an employer unilaterally to implement its own bargaining proposal regarding pension contributions after impasse.[7]

The later statute takes precedence.  Even in cases where a later statutory enactment conflicts with earlier *statutory* provisions, the more recent enactment prevails.  *E.g., EC Term of Years Tr. v. United States,* 550 U.S. 429, 435 (2007); *West Virginia CWP Fund v. Stacy*, 671 F.3d 378, 391 (4th Cir. 2011).  That result is even more compelled when Congress enacts a specific statutory provision that conflicts with pre-existing interpretations of an earlier statute.

---

[7] Of course, this 2014 MPRA provision has no effect whatsoever on a participating employer's pre-existing NLRA right to impose *other* terms and conditions of employment on its union-represented employees upon reaching a bona fide impasse in bargaining, including, for example, terms and conditions of employment pertaining to employee wage rates and health insurance benefits.

2.       Paragraph 53 of the Employer's responsive pleading alleges the following facts:  (a)  on an unspecified date, Local 6 filed an unfair labor practice ("ULP") charge with Region 4 of the NLRB "alleging [that] defendant's proposal to contribute to the Pension Fund only on behalf of current employees was unlawful and constituted bad faith bargaining"; (b) Region 4 investigated Local 6's ULP charge and, on August 27, 2015, "dismissed the allegations" underlying that charge; and (c) Local 6 did not exercise its right to appeal that dismissal to the NLRB's General Counsel.  And, on the basis of these alleged facts, the Employer's **third** affirmative defense states:  "The Region's dismissal of the ULP Charge and Local 6's acceptance of that dismissal preclude this action and the relief sought in this action in whole or in part."  *See* Answer, at p. 15.

The Employer's **third** affirmative defense also fails as a matter of law.  To the extent that the **third** affirmative defense rests on the assertion that the NLRB's dismissal of Local 6's ULP Charge and Local 6's alleged "acceptance" of that dismissal conclusively establish that the Employer had the right *under the NLRA* unilaterally to implement its proposal "to contribute to the Pension Fund only on behalf of current employees," that defense is flatly inconsistent with the 2014 MPRA provision that bars the Employer's **second** affirmative defense, as explained in the preceding section.

To the extent that the **third** affirmative defense rests on the notion that the NLRB's dismissal of Local 6's ULP charge has preclusive effect on the Fund's ERISA claim here, that defense fails for several reasons.  First, the Employer's responsive pleading does not allege any facts suggesting that the Fund was in privity with Local 6 or with any other party to the NLRB proceeding.  When the plaintiff in a lawsuit was not a party to the previous proceeding, privity is an essential element of a preclusion defense in that lawsuit.  *See Duckett v. Fuller*, 819 F.3d 740,

744 (4th Cir. 2016).  The failure to allege facts supporting that element is fatal to the defense.

Second, the NLRB had no jurisdiction to determine the Fund's ERISA claim.  *See Martin v. Garman Constr. Co.,* 945 F.2d 1000, 1003 (7th Cir. 1991).  Consequently, the Fund's ERISA claim did not merge into the NLRB proceeding (for purposes of claim preclusion), and there was no actual determination of any element of the Fund's ERISA claim in that NLRB proceeding (for purposes of issue preclusion).  *See id.* at 1003-04.

3.     The Employer's **fourth** affirmative defense states:  "This action is barred in whole or in part because issues raised fall within the exclusive jurisdiction of the [NLRB]."  *See* Answer, at p. 16.  This final affirmative defense in the Employer's first set of affirmative defenses also fails as a matter of law.

The Employer does not specify in its **fourth** affirmative defense what precise "issues raised" by "[t]his action" it believes fall within the NLRB's "exclusive jurisdiction."  Taken in context, however, we understand the Employer to be referring to those issues raised by the Employer itself in its **second** and **third** affirmative defenses:  *i.e.*, those issues bearing on whether the Fund's ERISA claim in this case can be defeated by the Employer's assertion that it did not violate the NLRA when it unilaterally implemented its bargaining proposal "to contribute to the Pension Fund only on behalf of current employees."  But, while the NLRB undoubtedly had jurisdiction to determine the local union's charge that the Employer violated *the NLRA* by unilaterally implementing its proposal at the time and under the circumstances when it attempted to do so, the NLRB had no jurisdiction over the Fund's ERISA claim, which is premised entirely on a statute over which the NLRB has no authority.  *See Martin*, 945 F.2d at 1003.

17

Instead, these issues fall squarely within this Court's subject matter jurisdiction to determine this action under ERISA. As set out *supra* p. 5, this Court undeniably has subject matter jurisdiction under ERISA to enforce the Employer's obligation to make contributions to the Pension Fund in accordance with the terms of the Preferred Schedule that the plan sponsor was required to impose upon the Employer under 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii). This subject matter jurisdiction necessarily encompasses the jurisdiction to consider and decide all issues raised by the Employer in an effort to defeat the Fund's action, even if those issues might otherwise be within the exclusive jurisdiction of the NLRB. *See, e.g., Connell Constr. Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 626 (1975).

B.      The Employer's Second Set of Affirmative Defenses

As previously noted, the Employer's second set of affirmative defenses (**fifth to ninth**) rests on the allegations in paragraphs 28-49 of the Employer's responsive pleading relating to the Pension Fund actuary's critical status certification.

These allegations underlying the Employer's second set of affirmative defenses are lengthier and more difficult to parse than the allegations underlying the Employer's first set of affirmative defenses. The crux of those allegations, however, is that the Pension Fund actuary's critical status certification was based on several changes in "actuarial assumptions" that undermine the certification's legitimacy. *See* Answer ¶¶ 28, 38-48.[8] "Because [a]ll the [statutory] rights asserted by plaintiff in this case" flow from the actuary's critical status certification, *see id.*, at p. 16, and that certification allegedly was based on changes in actuarial

---

[8] "For example," says the Employer in paragraph 39 of its responsive pleading, "the Pension Fund's actuary: (a) reduced the assumed long-term rate of return on investments from 7.5% to 6.5%; (b) changed the mortality assumption; and (c) increased the assumed annual administrative expense assumption."

assumptions that undermine its legitimacy, the Employer asserts in its **fifth to ninth** affirmative defenses that a judgment in favor of the Fund in this case would be unjust, inequitable or otherwise inappropriate, *see id.*  The Employer sprinkles words like "manipulated," "fraud" and "fraudulent" liberally throughout these allegations but, as we discuss below, these affirmative defenses fail as a matter of law regardless of those inflammatory labels.

These affirmative defenses fail as a matter of law on two independent grounds.  *First*, as we show in subsection 1 below, the Employer's attack on the propriety of the actuarial assumptions underlying the Pension Fund actuary's critical status certification is *not* an attack that a participating employer can pursue in an action such as this one brought to enforce the employer's contribution obligations under section 515 of ERISA.  *Second*, as we show in subsection 2 below, even if these affirmative defenses were permitted in a section 515 action, they fail because the Employer has not alleged facts that make them plausible under the applicable *Twombly-Iqbal* standards.

1.     As previously discussed *supra* p. 5, this is an ERISA action on behalf of a multiemployer pension plan to enforce a contribution obligation arising under the 2006 PPA (as amended by the 2014 MPRA) that is deemed to be a contribution obligation under section 515 of ERISA, 29 U.S.C. § 1145.  Accordingly, the threshold question presented by the Employer's second set of affirmative defenses is whether affirmative defenses resting on an allegation that a multiemployer pension plan actuary used improper assumptions in making a critical status certification are legally cognizable defenses in a case brought to enforce a participating employer's contribution obligations under section 515.  For the reasons set out below, the answer to this question is "no."

Based on our research, this question is one of first impression.  However, the answer to this question can be found by consulting the substantial body of case law that strictly limits the affirmative defenses that can be asserted under section 515, and by taking into account certain additional considerations unique to the comprehensive statutory scheme created by the 2006 PPA as amended by the 2014 MPRA.

By way of background, section 515 was enacted in 1980 as part of an earlier effort by Congress to safeguard and promote the financial health of multiemployer pension plans.  As shown by the legislative history of that earlier enactment, the animating purposes of section 515 are to discourage participating employers from shirking their contribution obligations to such pension plans and to give the pension plans a potent, cost-effective and swift legal remedy for enforcing those contribution obligations.  As the Senate Committee report on the 1980 legislation explained:

> Delinquencies of employers in making required contributions are a serious problem for most multiemployer plans.  Failure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans. . . .
>
> These costs detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. . . .
>
> Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly.  Some simple collection actions brought by plan trustees have been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions.  This should not be the case.  Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously. . . .
>
> The intent of [§ 515] is to promote the prompt payment of contributions and assist plans in recovering the costs incurred in connection with delinquencies.

S. Comm. on Labor & Human Res., 96th Cong., 2d Sess., 43-44 (Comm. Print 1980).

Consistent with these purposes, section 515 uniformly has been interpreted by the federal courts as barring the assertion of virtually all affirmative defenses to an action seeking to enforce an employer's contribution obligations to a multiemployer pension plan; including, most pertinently here, affirmative defenses "going to the formation of the collective bargaining agreement [giving rise to the employer's contribution obligations] such as fraud in the inducement."  *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 313 (2d Cir. 1990). *See also, e.g., Ralph's Grocery*, 118 F.3d at 1021-22 (surveying this case law as it stood in 1997, and stating, in pertinent part, that section 515 bars the assertion of affirmative defenses "that relate to claims the employer may have against the union such as "fraud in the inducement" and "mistake of fact"); *Construction Indus. Laborers, Pension Fund v. Wellington Concrete LLC*, No. 15-804, 2016 WL 3021586, at 2 (D. Mo. March 31, 2016) (surveying this case law up to the present and stating that, under this case law, "[d]efenses based on union conduct are barred by ERISA § 515").[9]

The parallel question here is whether affirmative defenses resting on an allegation that a multiemployer pension plan actuary used improper assumptions in making a critical status certification—a certification that*, inter alia*, serves as a necessary predicate for increases in employer contribution rates to the pension plan pursuant to a statutorily-mandated rehabilitation plan—should be treated in the same fashion as affirmative defenses resting on an allegation of

---

[9] The narrow exceptions to this general rule barring the assertion of affirmative defenses to a section 515 action are:  (1) "the pension contributions themselves are illegal"; (2) "the collective bargaining agreement is void *ab initio*, as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement"; and (3) "the employees have voted to decertify the union as their exclusive bargaining representative, thus prospectively voiding the union's collective bargaining agreement."  *See Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992).

improper union conduct "going to the formation of the collective bargaining agreement [giving rise to the employer's contribution obligations] such as fraud in the inducement."  They *should* be treated in the same fashion, we submit, for three reasons.

*First*, if such affirmative defenses were allowed, then *every* participating employer that has experienced a contribution rate increase by reason of a pension plan actuary's critical status certification could resist paying that increase and defend against a section 515 action to collect that increase on the ground that the certification was based on improper actuarial assumptions.  And, the same is true of the automatic surcharge that *every* participating employer is obligated to pay by reason of the plan actuary's critical status certification; an obligation which also is enforceable under section 515.  *See* 29 U.S.C. § 1085(e)(7); *see also* Answer ¶ 49 (complaining about the imposition of this surcharge).  Such a result would greatly slow down and complicate actions to collect contributions that the participating employers owe, and would thus be squarely at odds with section 515's purposes—purposes that are especially vital in the context of a pension plan that is in significant financial distress.

*Second*, the annual certification process in which a multiemployer pension plan actuary assesses the pension plan's financial health and certifies the plan's financial status to the Secretary of the Treasury and the plan sponsor is one step in an extraordinarily comprehensive statutory scheme (the 2006 PPA as amended by the 2014 MPRA) that Congress crafted with considerable care.  That comprehensive statutory scheme expressly affords participating employers the right to challenge *two* and *only* two types of allegedly improper action taken under the statute:  (1) the plan sponsor's allegedly improper action taken in connection with its adoption, updating and compliance with the terms of a statutorily-mandated rehabilitation plan, *see* 29 U.S.C. § 1132(a)(10); and (2) the plan sponsor's allegedly improper action taken in

connection with its provision of required notices to the employers under 29 U.S.C. §§ 1021(f)(1)(B)(v) and 1021(k)(1)(K), *see* 29 U.S.C. §§ 1132(a)(8) & (11).  Against this statutory background, it cannot seriously be maintained that Congress, *by its silence*, intended to give the courts a green light to recognize an additional exception to the general rule barring the assertion of affirmative defenses to a section 515 action under which a participating employer would have the right to challenge allegedly improper action *taken in connection with the annual certification process*, either by the plan sponsor or the plan actuary.  *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) ("The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a comprehensive and reticulated statute") (internal quotation marks omitted); *see also Nw. Airlines v. Transp. Workers Union*, 451 U.S. 77, 97 (1981) ("The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.").

On this point, the recent decision in *Dairy v. Dairy Employees Union Local No. 17*, No. 13-1112, 2015 U.S. Dist. LEXIS 171875 (E.D. Cal. Dec. 23, 2015), is instructive.  There, the court held that because Congress has enacted "a comprehensive legislative scheme" governing a multiemployer pension plan's assessment of withdrawal liability against employers who permanently cease participation in the plan, and because in that legislative scheme Congress has listed the various types of defenses that employers may assert against a withdrawal liability assessment, the defendant employer was barred from asserting a defense of a different type that Congress had omitted from its list of defenses available under the statute.  *See id.*, at *50-51. Similar reasoning obtains here with respect to the Employer's second set of affirmative defenses.

*Third*, and finally, the conclusion that the Employer's second set of affirmative defenses are barred by section 515 would leave "no awkward gap in the statutory scheme." *Dairy*, 2015 U.S. Dist. LEXIS 171875, at *51.  That is so because in section 502(a)(5) of ERISA, 29 U.S.C. § 1132(a)(5), Congress has given the Secretary of Labor the sweeping power to sue for redress of "any act or practice which violates any provision of [ERISA]"; a sweeping power that unquestionably encompasses the power to sue for redress of any improper conduct engaged in by a pension plan actuary which violates the actuary's statutory duties in connection with the certification of the plan's financial status.  ERISA requires that the actuary's certification be filed with the Secretary of the Treasury, 29 U.S.C. § 1085(b)(3)(A), and also requires that notice of the certification be provided to both the Secretary of Labor and the Pension Benefit Guaranty Corporation, 29 U.S.C. § 1085(b)(3)(D).  The plan also must send participating employers, within 30 days after a written request, copies of a plan's periodic actuarial reports, financial reports, details relating to the rehabilitation plan itself, and other similar information.  29 U.S.C. §§ 1021(k), 1024(b)(4), (d).  All this being so, a plan actuary's violation of its statutory duties in connection with a certification is unlikely to go unnoticed.  And of course, there is nothing to stop a participating employer from bringing such violations to the Secretary of Labor's attention and urging the Secretary to seek appropriate redress under 29 U.S.C. § 1132(a)(5).

To the extent that the Employer's **fifth to ninth** affirmative defenses rest on the allegation that the Pension Fund actuary's critical status certification was flawed because the Board of Trustees, acting in its role as plan sponsor, violated its duty under 29 U.S.C. § 1085(b)(3)(B)(iii) to "act reasonably and in good faith" in providing the information underlying the actuary's projection of expected future employer contributions, *see* Answer ¶ 41, the result under section 515 is the same.  To allow participating employers to assert affirmative

defenses resting on such an allegation of improper action by the plan sponsor would be squarely at odds with section 515's purposes for the same reasons set out above with respect to affirmative defenses resting on an allegation of improper action by the plan actuary.  It would also be squarely at odds with the conclusion to be drawn from an examination of the "comprehensive legislative scheme" created by the 2006 PPA as amended by the 2014 MPRA: *to wit*, that Congress did not intend to give the courts a green light to recognize an additional exception to the general rule barring the assertion of affirmative defenses to a section 515 action under which a participating employer would have the right to challenge allegedly improper action *taken in connection with the annual certification process*, either by the plan actuary *or the plan sponsor*.  Moreover, the sweeping power given by Congress to the Secretary of Labor to sue for redress of "any act or practice which violates any provision of [ERISA]" extends equally to statutory violations committed by the plan actuary or the plan sponsor.

For all of these reasons, this Court should hold that the Employer's **fifth to ninth** affirmative defenses are not legally cognizable defenses under section 515, and thus cannot as a matter of law defeat this action brought by the Fund to enforce the Employer's contribution obligations under section 515.

2.      Finally, assuming *arguendo* that the Employer's **fifth to ninth** affirmative defenses are legally cognizable under section 515, those affirmative defenses still fail as a matter of law, because the factual allegations on which those affirmative defenses rest do not satisfy the applicable *Twombly-Iqbal* standards.

As previously noted, the PPA expressly provides that the actuarial projections underlying a multiemployer pension plan actuary's annual certification of the pension plan's financial status "shall be based on *reasonable* actuarial estimates, assumptions, and methods that . . . offer the

actuary's best estimate of anticipated experience under the plan." *Supra* p. 3 (citing 29 U.S.C. § 1085(b)(3)(B)(i)) (emphasis added).  Accordingly, on the face of the statute, the legal standard for evaluating the propriety of the actuarial assumptions underlying a pension plan actuary's certification of the plan's financial status is whether those assumptions are "reasonable."  With respect to the single assumption that requires information from the plan sponsor—the "projection of activity in the industry . . . covered by the plan, including future covered employment and contribution levels"—the legal standard is that the plan sponsor "shall act reasonably and in good faith."  29 U.S.C. § 1085(b)(3)(B)(iii).

The PPA itself does not define a "reasonable actuarial assumption."  But in using the phrase "reasonable actuarial assumptions" in the PPA, Congress did not write on a blank slate.  Rather, Congress acted against the background of other pre-PPA statutory provisions requiring that certain actions or decisions be based on "reasonable actuarial assumptions," including, of most direct relevance here, the ERISA provisions at issue in *Dairy v. Dairy Employees Union Local No. 17*, *supra*, under which multiemployer pension plans assess withdrawal liability against employers who permanently cease participation in the plan.  And, the case law that has developed under these other provisions gives ample meaning to the phrase "reasonable actuarial assumptions" as that phrase is used in the PPA.[10]  This case law includes, *e.g.*, *Board of Trustees, Michigan United Food & Commercial Workers Union v. Eberhard Foods, Inc.*, 831 F.2d 1258 (6th Cir. 1987); *Combs v. Classic Coal Corp.*, 931 F.2d 96, 100 (D.C. Cir. 1991); and *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346 (7th Cir. 1992).

---

[10] *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85-86 (2006) ("[W]hen 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'") (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)).

This case law establishes two basic legal principles that dictate the outcome of the *Twombly-Iqbal* analysis here.  First, under this case law, the judicial inquiry is limited to determining whether the actuary's assumptions were *objectively* reasonable; that is, whether the actuary, in making the assumptions at issue, took proper account of the various factors that one would expect a "reasonable" actuary exercising proper professional judgment to take account of.  Second, given that actuarial assumptions are predictive in nature and "precognition is so rare," *Artistic Carton*, 971 F.2d at 1348, in assessing the objective reasonableness of an actuary's assumptions in a given case, those assumptions must be afforded a "wide range of 'reasonableness,'" *id.  See also, e.g., Combs*, 931 F.2d at 100 (because "[g]reat differences of opinion exist as to actuarial methods" and actuarial calculations are "not an exact science," there exists "a range of reasonable actuarial determinations.").

In its responsive pleading, the Employer does *not* plead *a single fact* that would, if proven, establish that the Pension Fund actuary made one or more objectively unreasonable actuarial assumptions in making the critical status certification at issue.  To the contrary, the Employer's attack on certain changes from prior actuarial assumptions rests entirely on the allegation that those changes were made with what the Employer apparently deems to be a *subjectively bad motive*:  namely, to allow the Pension Fund "to unilaterally impose a contribution schedule" on participating employers and to make reductions in plan benefits that would otherwise have been prohibited by ERISA's anti-cutback rule.  *See* Answer ¶¶ 28-38, 43.  That being so, the Employer's responsive pleading is wholly devoid of the "factual content" that is required under the applicable *Twombly-Iqbal* standards, *see supra* pp. 12-13, to make out a plausible affirmative defense (assuming *arguendo* that such a defense is legally cognizable under

27

section 515) that the Pension Fund's actuary violated its duties under the PPA to base its critical status certification on objectively reasonable actuarial assumptions.

Two examples suffice to illustrate how grossly deficient the Employer's pleading is in this regard.  The Employer criticizes the actuarial assumptions made by the Pension Fund's actuary in its critical status certification because the actuary "reduced the assumed long-term rate of return on investments from 7.5% to 6.5%."  *See* Answer ¶ 39(a).  Needless to say, forecasting a long-term rate of return on investments is an inherently uncertain exercise that involves a large degree of educated guess-work as to how financial markets will behave over time.  In paragraph 41 of its responsive pleading, the Employer makes reference to a "2012 Actuarial Valuation Report," but conveniently neglects to mention that according to this Report, the Pension Fund's average rate of return on investments over the twenty-year period preceding the critical status certification was exactly 6.5%.  That omitted fact obviously pushes strongly in favor of the conclusion that the actuary's 2012 assumption of a 6.5% rate of return on investments rather than the more optimistic 7.5% rate of return was objectively reasonable at a minimum, and the Employer alleges *no* fact pushing in the opposite direction.

Another of the Employer's criticisms is that the actuary, in making its critical status certification, "changed the mortality assumption."  *See* Answer ¶ 39(b).  Like forecasting investment returns, forecasting mortality rates is an inherently uncertain exercise involving a degree of educated guess-work.  The Society of Actuaries recommends use of the mortality assumption methodology followed by the actuary here as a general rule.[11]  Yet the Employer's responsive pleading does not even bother to identify what the mortality assumption methodology

---

[11] *See* SOCIETY OF ACTUARIES, THE RP-2000 MORTALITY TABLES, EXECUTIVE SUMMARY at 5, *available at* https://www.soa.org/Files/Research/Exp-Study/rp00_mortalitytables.pdf.

followed by the actuary here entails, much less plead any facts casting doubt on its objective reasonableness.

Nor can the Employer's affirmative defenses find plausible support in the alleged fact that each of the five changes in actuarial assumptions the Employer seizes on by way of "example" were a "one-way ratchet," *i.e.*, that each of them tended either to increase expected cost or decrease expected income. *See* Answer ¶¶ 39-42. That alleged fact is entirely consistent with the conclusion that each of the five changes (including the two changes discussed above) was objectively reasonable taken on its own terms—if not mandated by new facts or changed circumstances that any "reasonable" actuary exercising proper professional judgment would take account of.

With respect to the assumption about future industry activity, for which a plan sponsor is required to provide input "act[ing] reasonably and in good faith," the Employer alleges only that

> the Pension Fund forecasted expected future contributions from employers below both actual contributions, which increased from 2012 to 2013 by over $6 million, and projected contributions as stated in its 2012 Actuarial Valuation Report. The Pension Fund evidently did not factor in the withdrawal liability that employers would owe in the event that they ceased participation in the Pension Plan.

Answer ¶ 41. The first allegation in this paragraph simply notes that the actual number for employer contributions turned out, with full benefit of hindsight, to be higher than the forecast of employer contributions made by the actuary in its critical status certification. This allegation does not plausibly support an inference that the forecast was unreasonable or in bad faith at the time it was made. The second allegation in this paragraph simply notes that the projection of employer contributions in a "2012 Actuarial Valuation Report"—a Report which *postdated* the actuary's critical status certification—was higher than the forecast contained in the certification. This allegation likewise does not plausibly support an inference that the forecast was

unreasonable or in bad faith at the time it was made.  That is especially so considering the fact

that under the PPA an actuary's critical status certification triggers an automatic surcharge on

participating employers, *see supra* p. 22, making it eminently reasonable to assume in a

subsequent actuarial report that employer contributions in the ensuing plan year will be higher

than previously projected, everything else being equal.  And the final allegation in this paragraph

also does not plausibly support an inference that the forecast of employer contributions in the

actuary's certification was unreasonable or in bad faith, when one considers that collecting

withdrawal liability is consistently less predictable than collecting ongoing contributions,

because many withdrawals occur when employers declare bankruptcy or go out of business.[12]

The Employer's use of the words "manipulated" and "fraudulent" to describe the

actuarial assumptions underlying the actuary's critical status certification, *see* Answer ¶¶ 28, 48,

does not change the required outcome.  Under Fed. R. Civ. P. 9(b), an allegation of fraud

requires "stat[ing] with particularity the circumstances constituting fraud," and these

circumstances "are 'the time, place, and contents of the false representations, as well as the

identity of the person making the misrepresentation and what he obtained thereby.' *Harrison v.*

*Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (quoting 5 Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1297, at 590 (2d ed.1990))." *See*

*Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015); *see also Aguilar*, No. DKC

11-2416, 2011 WL 5118325, at *4 (striking an affirmative defense resting on a "conclusory

statement of 'fraud'").  Here, as we have shown, the Employer's allegations do not even include

---

[12] The most notable withdrawal from the Pension Fund, which occurred in December 2011, was
the withdrawal of Hostess Brands (the maker of Wonder Bread, Twinkies, and many other
products).  That employer's entire withdrawal liability to the Pension Fund in the amount of
nearly $920 million was discharged without payment in the bankruptcy court.  *See In re Hostess*
*Brands, Inc.*, 499 B.R. 406 (S.D.N.Y. 2013).

facts that would support a reasonable inference that the actuarial assumptions were objectively

unreasonable.  *A fortiori*, those allegations do not support a reasonable inference that the

actuarial assumptions were knowingly "false"—assuming that "truth" or "falsity" is even a

meaningful concept when it comes to actuarial assumptions.  All that the Employer has done in

this regard is use inflammatory labels, without underlying facts, and such labels do not satisfy

Rule 9(b) or the applicable *Twombly-Iqbal* standards.

There is no need to belabor the point.  At every turn, the Employer's **fifth to ninth**

affirmative defenses fail on independent, *Twombly-Iqbal* grounds.  Accordingly, those

affirmative defenses cannot as a matter of law defeat this action brought by the Fund to enforce

the Employer's contribution obligations under section 515 of ERISA, even assuming *arguendo*

that those affirmative defenses would be legally cognizable under section 515 if adequately pled.

## III.   <u>THE SPECIFIC RELIEF TO WHICH THE FUND IS ENTITLED</u>

The specific relief requested by the Fund in the accompanying Rule 12(c) Motion—to

which the Fund is legally entitled for the reasons set out above—is a declaratory judgment

stating that "the Defendant is bound by the schedule of contributions that the Pension Fund

implemented effective as of October 27, 2015, and that the Defendant is therefore obligated to

make contributions to the Pension Fund for all employees performing work in job classifications

covered by the collective bargaining agreement that expired on April 30, 2015, including all

employees hired on or after November 2, 2015."

As previously noted, the Fund also is entitled under ERISA to various categories of

ancillary monetary relief as a consequence of the Employer's refusal to make the contributions at

issue.  Should this Court grant the Fund's Rule 12(c) Motion, the Fund will promptly make a

calculation of the monetary relief that the Fund believes is due and owing under the statute and

attempt to secure the Employer's stipulation to that calculated amount.  Should the Employer

dispute any item(s) of monetary relief included in this calculation, the Fund will file with the

Court whatever additional motion(s) for relief may be appropriate on a further schedule set by

the Court.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Fund's Motion for Judgment on the Pleadings on Liability

should be granted.

Respectfully submitted,

/s/ Andrew D. Roth
Julia Penny Clark (Bar No. 12401)
Andrew D. Roth (Bar No. 19601)
BREDHOFF & KAISER, P.L.L.C.
805 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile:  (202) 842-1888
jpclark@bredhoff.com
aroth@bredhoff.com

Counsel for Plaintiffs

Dated:  June 24, 2016

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2016, a true and correct copy of the foregoing Memorandum of

Points and Authorities in Support of Plaintiffs' Rule 12(c) Motion for Judgment on the Pleadings

on Liability was electronically filed using the CM/ECF system, which will send notification to

the following:

Elizabeth Anne Scully
David A. Rivkin
Jay P. Krupin
Mark Wendell Delaquil
Baker and Hostetler LLP
1050 Connecticut Ave NW Ste 1100
Washington, DC 20036

/s/ Andrew D. Roth
Andrew D. Roth
