IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

| | |
|---|---|
| BAKERY AND CONFECTIONERY UNION<br>AND INDUSTRY INTERNATIONAL<br>PENSION FUND,<br><br>        and<br><br>TRUSTEES OF THE BAKERY AND<br>CONFECTIONERY UNION AND INDUSTRY<br>INTERNATIONAL PENSION FUND,<br><br><br>                Plaintiffs,<br><br>        v.<br><br>JUST BORN II, INC.<br>dba GOLDENBERG CANDY COMPANY<br><br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
8:16-cv-00793-DKC

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S CROSS-
MOTION FOR JUDGMENT ON THE PLEADINGS, AND IN REPLY IN SUPPORT
OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS ON LIABILITY**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 2

    I.    THE EMPLOYER'S FIRST ARGUMENT IS FATALLY FLAWED ................. 2

        A.    The Employer's Lead Assertion ................................................. 2

        B.    The Employer's Reliance on *Advanced Lightweight Concrete* ................. 4

        C.    The Employer's Various Assertions Under the Heading, "Just Born Has No Obligation To Contribute for New Employees Under Federal Labor Law" ..................................................................... 6

        D.    The Employer's Other Assertions Respecting the Proper Interpretation of the ERISA Provision on Which the Fund's ERISA Claim Rests ..................................................................... 9

    II.    THE EMPLOYER'S SECOND ARGUMENT IS FATALLY FLAWED ............ 13

        A.    The Employer's First Set of Affirmative Defenses .................................. 14

        B.    The Employer's Second Set of Affirmative Defenses ............................... 14

            1.    The Legal Cognizability Issue ...................................................... 14

            2.    The *Twombly-Iqbal* Issue.............................................................. 21

CONCLUSION ..................................................................................... 25

## TABLE OF AUTHORITIES

*Bakery & Confectionery Union & Indus. Int'l Pension Fund v. New World Pasta Co.,*
309 F. Supp. 2d 716 (D. Md. 2004) ...................................................................... 2, 7

*Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,*
118 F.3d 1018 (4th Cir. 1997) ................................................................... 16, 17, 21

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.,* 508 U.S. 602 (1993) ........................ 15

*Dairy v. Dairy Employees Union Local No. 17,* 153 F. Supp. 3d 1217 (E.D. Cal. 2015),
*appeal docketed,* No. 16-15107 (9th Cir. Jan. 25, 2016).................................... 19, 20

*K mart Corp. v. Cartier, Inc.,* 486 U.S. 281 (1988)........................................................ 9

*Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,*
484 U.S. 539 (1988) ...........................................................................................4-6, 10

*Long v. Welch & Rushe, Inc.,* 28 F. Supp. 3d 446 (D. Md. 2014)................................. 22

*Martin v. Garman Constr. Co.,* 945 F.2d 1000 (7th Cir. 1991).................................... 14

*Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134 (1985)................................. 18

*Northwest Airlines v. Transport Workers Union,* 451 U.S. 77 (1981) ......................... 18

*Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41 (1987) ........................................... 18

*Provident Life & Accident Insurance Co. v. Cohen*, 423 F.3d 413 (4th Cir. 2005) .............. 18, 21

*Provident Life & Accident Insurance Co. v. Waller,* 906 F.2d 985 (4th Cir. 1990) .................... 18

*Sullivan v. Stroop,* 496 U.S. 478 (1990) ..................................................................... 9

*The Last Best Beef, LLC v. Dudas,* 506 F.3d 333 (4th Cir. 2007) ......................... 11, 12

*Trustees of Local 138 Pension Fund v. F.W. Honerkamp Co., Inc.,*
692 F.3d 127 (2d Cir. 2012) ...................................................................................... 12

*United States v. Pittman,* 209 F.3d 314 (4th Cir. 2000).............................................. 24

## STATUTES

29 U.S.C. § 1085(b)(2) .............................................................................................. 15

29 U.S.C. § 1085(b)(3)(A)......................................................................................... 15

29 U.S.C. § 1085(b)(3)(B)(i) ........................................................................ 15

29 U.S.C. § 1085(b)(3)(B)(iii) ...................................................................... 16

29 U.S.C. § 1085(e)(3)(B) ............................................................................. 8

29 U.S.C. § 1085(e)(3)(C) ............................................................................. 5

29 U.S.C. § 1085(e)(3)(C)(ii) ........................................................................ 8

29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) .......................................................... *passim*

29 U.S.C. § 1085(e)(3)(C)(iv) .................................................................. 5, 14

29 U.S.C. § 1085(j)(1) ................................................................................... 3

29 U.S.C. § 1401(a)(3)(B) ........................................................................... 20

29 U.S.C. 1145 ............................................................................................ 14

## OTHER AUTHORITIES

160 Cong. Rec. 6861-63 (daily ed. Dec. 15, 2014) ................................... 12

## INTRODUCTION

Plaintiffs Bakery & Confectionery Union and Industry International Pension Fund ("Pension Fund") and its Trustees (collectively, "the Fund") have moved for judgment on the pleadings on the issue of the liability of Defendant Just Born ("the Employer") under ERISA for certain unpaid contributions to the Pension Fund.  In its supporting Memorandum ("Pl. Mem."), the Fund has shown that it is entitled to judgment on the pleadings on liability for two reasons.  First, on the undisputed facts of record, the Fund has stated a valid ERISA claim against the Employer.  *See* Pl. Mem. at 9-11.  Second, none of the Employer's defenses to the Fund's ERISA claim is legally tenable.  *See id.* at 11-31.

The Employer has responded by opposing the Fund's motion for judgment on the pleadings and cross-moving for judgment on the pleadings in its favor.  In its responsive Memorandum ("Def. Mem."), the Employer makes, in broad brush terms, two arguments.  The first argument is that the Fund has *not* stated a valid ERISA claim on the undisputed facts of record, thus entitling the Employer, rather than the Fund, to judgment on the pleadings.  *See* Def. Mem. at 8-17.  The second argument is that this Court should evaluate the Employer's affirmative defenses under a "motion-to-strike standard" and "[s]hould [n]ot [s]trike" those defenses.  *See id.* at 17-30.  As we show herein, both of these arguments are fatally flawed.

Before turning to this showing, however, we feel compelled to respond to the bald assertion in the very first paragraph of the Employer's responsive Memorandum that an employer has "the right to agree to participate in" a multiemployer pension plan "on behalf of all, *some*, or none of its [bargaining unit] employees."  *See* Def. Mem. at 1 (emphasis added).  As we pointed out in our prior Memorandum, and as we elaborate below, an employer has no such "right."  Quite to the contrary, a multiemployer pension plan has the right to adopt rules for plan

participation that are binding on all employers who wish to participate; and the Plaintiff Pension Fund here has a longstanding rule that strictly prohibits an employer from participating in the plan and making contributions only on behalf of "*some* . . . of its [bargaining unit] employees," as the Employer here seeks to do by purporting to carve out "new employees" from its contribution obligation to the Fund.  *See* Pl. Mem. at 1-2.  Indeed, this Court recognized as much in the *New World Pasta* decision[1] cited in our prior Memorandum—a decision the Employer conspicuously ignores in its responsive Memorandum.

## ARGUMENT

## I.   THE EMPLOYER'S FIRST ARGUMENT IS FATALLY FLAWED

In support of its first argument that the Fund has not stated a valid ERISA claim on the undisputed facts of record, the Employer advances a potpourri of legal and factual assertions, none of which bears scrutiny.

### A.   The Employer's Lead Assertion

The Employer's lead assertion is that it is not a "'bargaining part[y]' within the meaning of" the ERISA provision, 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii), on which the Fund's ERISA claim rests, thereby rendering that ERISA provision inapplicable here.  *See* Def. Mem. at 9-11.  That simply is not so under a plain reading of the statute as applied to the undisputed facts of record.

To reiterate, *see* Pl. Mem. at 4, the ERISA provision on which the Fund's claim rests provides, in pertinent part:

> If a collective bargaining agreement providing for contributions
> under a multiemployer plan in accordance with a schedule provided
> by the plan sponsor pursuant to a rehabilitation plan . . . expires while
> the plan is still in critical status, and after receiving one or
> more updated schedules from the plan sponsor . . . , *the bargaining*

---

[1] *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. New World Pasta Co.*, 309 F. Supp. 2d 716 (D. Md. 2004).

> *parties with respect to such agreement* fail to adopt a contribution
> schedule with terms consistent with the updated rehabilitation plan
> and a schedule from the plan sponsor, then the contribution schedule
> applicable under the expired collective bargaining agreement, as
> updated and in effect on the date the collective bargaining agreement
> expires, shall be implemented by the plan sponsor [effective 180 days
> after the date on which the collective bargaining agreement expired].

*See* 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) (emphasis added).

Contrary to the impression that one might draw from the Employer's briefing of this issue, this ERISA provision does not use the term "bargaining parties" in a vacuum. Rather, it makes reference to "the bargaining parties *with respect to*" a particular collective bargaining agreement; namely, a collective bargaining agreement "providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan [that] expires while the plan is still in critical status."

On the undisputed facts of record, the relevant collective bargaining agreement "providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan [that] expire[d] while the plan [was] still in critical status" is the March 2012-April 2015 collective bargaining agreement between the Employer and Local 6. *See* Pl. Mem. at 5-7; Def. Mem. at 5. The Employer unquestionably is a "bargaining part[y] *with respect to*" this March 2012-April 2015 collective bargaining agreement, inasmuch as the statute defines a "bargaining party" to include "an employer who has an obligation to contribute under the plan," *see* 29 U.S.C. § 1085(j)(1), and the Employer itself acknowledges, as it must, that under the March 2012-April 2015 collective bargaining agreement it "agreed to make contributions to the Pension Fund . . .," *see* Def. Mem. at 5. Thus, the Employer most certainly is a "'bargaining part[y]' within the meaning of" the ERISA provision on which the Fund's claim rests.

In resisting this conclusion, the Employer maintains that is not a "'bargaining party' within the meaning of" § 1085(e)(3)(C)(ii)-(iii) because the final best offer that it imposed on Local 6 upon reaching an impasse in bargaining over a new agreement to replace the parties' expired March 2012-April 2015 agreement did not obligate the Employer to contribute to the Pension Fund on behalf of new employees.  *See* Def. Mem. at 9-10.  This is a patent *non sequitur* that is belied by the plain language of § 1085(e)(3)(C)(ii)-(iii).

B.    The Employer's Reliance on *Advanced Lightweight Concrete*

The Employer goes on to assert that the Fund's ERISA claim is defeated by the Supreme Court's decision in *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539 (1988), in which the Court purportedly "rejected arguments nearly identical to Plaintiffs' arguments in this case."  *See* Def. Mem. at 11.  This assertion is baseless.

The issue presented in *Advanced Lightweight Concrete* was whether a multiemployer pension plan had a right of action under ERISA to enforce an employer's statutory duty arising under the National Labor Relations Act ("NLRA") to continue making contributions to the plan under an expired collective bargaining agreement until such time as an impasse in bargaining over a new agreement had been reached.  The Supreme Court held that the plan did not have such a right of action, reasoning that "the [t]ext of [ERISA] § 515 plainly describes the employer's contractual obligation to make contributions but omits any reference to a noncontractual obligation imposed by the NLRA," 484 U.S. at 546, thus making it "plain" that Congress did not intend to provide for such a right of action, *id.* at 551.

In an effort to make *Advanced Lightweight Concrete* appear relevant (indeed, controlling) here, the Employer asserts that the Fund's claim in this case is "premised on the argument" that the Employer has a duty to contribute to the Fund on behalf of new employees that arises under a

"*labor-management relations law*" (*i.e.*, under the NLRA).  *See* Def. Mem. at 11 (emphasis

added).  But that is, in point of fact, a gross mischaracterization of the "argument" on which the

Fund's claim is "premised."  As our prior Memorandum makes clear, *see* Pl. Mem. at 4, 9-10,

the Fund's claim is "premised on the argument" that the Employer has a duty to contribute to the

Fund on behalf of new employees that arises under *an ERISA provision*, 29 U.S.C.

§ 1085(e)(3)(C), adopted in 2006 and amended in 2014.

The fact that the Fund's claim is "premised" on a recently-enacted ERISA provision and

*not* (as the Employer maintains) on the NLRA readily distinguishes the instant case from the

*Advanced Lightweight Concrete* case.  As noted above, the *Advanced Lightweight Concrete*

Court held that the multiemployer pension plan plaintiff in that case did not have a right of action

under ERISA to enforce a statutory contribution duty arising *under the NLRA* because it was

"plain" from the text of ERISA that Congress did not intend to provide for such a right of action.

However, as set out in Pl. Mem. at 5, the subsequently-enacted ERISA provision relied on by the

Fund here as the source of the Employer's duty to contribute to the Fund in accordance with the

rehabilitation plan contribution schedule expressly provides that any failure by an employer to

make such a statutorily-required contribution "shall be treated as a delinquent contribution under

[ERISA section 515] and shall be enforceable as such."  *See* 29 U.S.C. § 1085(e)(3)(C)(iv).  This

ERISA provision makes it equally "plain" that Congress *did* intend to provide for the right of

action asserted by the Fund in this case.

In short, there is no reality whatsoever in the Employer's proclamation that in the

*Advanced Lightweight Concrete* case, "the Supreme Court rejected arguments nearly identical to

Plaintiffs' arguments in this case."  *See* Def. Mem. at 11.  As we have shown, "Plaintiffs'

arguments in this case" are based on a recently-enacted ERISA provision that obviously was not at issue in the *Advanced Lightweight Concrete* case, decided in 1988.

      C.      The Employer's Various Assertions Under the Heading, "Just Born Has
               No Obligation To Contribute for New Employees Under Federal Labor Law"

      The Employer goes on to make various additional assertions under the heading, "Just Born Has No Obligation To Contribute for New Employees Under Federal Labor Law." *See* Def. Mem. at 12-14. This heading is not on point, because as just discussed, the Fund has made no claim in this case that the Employer has an obligation to contribute for new employees that arises *under federal labor law*. In any event, we address each of these additional assertions in the order in which they are presented by the Employer, and show that none has a stitch of merit.

      1.      The Employer's first assertion under this heading is that this Court should "find" that the Employer does not have an obligation to contribute on behalf of new employees *under federal labor law* because, under federal labor law, an employer is free to make unilateral changes in existing terms and conditions of employment upon reaching an impasse in bargaining with its counterpart union, and neither the Fund nor Local 6 has contested or called into question the fact that the bargaining parties were at a bargaining impasse when the Employer unilaterally implemented its final best offer to Local 6 under which the Employer would no longer contribute to the Fund on behalf of new employees. *See* Def. Mem. at 12-13. The short answer to this first assertion is that there is no need for this Court to make a "find[ing]" on this issue one way or the other, inasmuch as the Fund has made no claim in this case that the Employer has an obligation to contribute for new employees *under federal labor law*. The ERISA provision on which the Fund *does* rely applies by its explicit terms when the bargaining parties have failed to reach a new collective bargaining agreement within 180 days after the parties' earlier collective

bargaining agreement has expired.  The federal labor law doctrine the Employer invokes simply has no bearing on that ERISA provision.

2.     The Employer's second assertion under this heading is that "[n]otably, the Pension Fund has not asserted that Just Born is violating the Fund's rules" by failing to contribute on behalf of new employees.  *See* Def. Mem. at 13.  That simply is not so.  The Fund pointedly asserted at the very outset of its prior Memorandum that Just Born's effort to carve out new employees from its contribution obligation to the Fund would violate the Fund's longstanding rule requiring each and every participating employer to make contributions on behalf of *all* of its bargaining unit employees, so that no participating employer can effectively reduce its contribution rates to the detriment of the Fund or other participating employers.  *See* Pl. Mem. at 1-2 (citing, *inter alia*, this Court's decision in *New World Pasta*, *supra*).

3.     The Employer's third assertion under this heading is that the Fund's claim in this case "is an erroneous attempt to circumvent an employer's long-held rights [under federal labor law] when a bona fide impasse is reached during negotiations."  Def. Mem. at 13.  This assertion is nothing more than a conclusory statement of the argument, spelled out in detail in the next section of the Employer's responsive Memorandum, that the ERISA provision on which the Fund's claim rests, 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii), cannot properly be interpreted as working a "repeal by implication [of] 60 years of labor law."  *See* Def. Mem. at 15.  But as we show *infra* pp. 10-11, that argument is wholly without merit.

4.     The Employer's fourth and last assertion under this heading is that the Fund's interpretation of § 1085(e)(3)(C)(ii)-(iii), *see* Pl. Mem. at 4, 9-10, is a "nonsensical" one that, if accepted, "would dramatically rework settled labor law" by allowing a pension fund in critical status to make "fundamental changes" in the bargaining parties' existing terms of

participation in the fund "under the guise of imposing a contribution schedule." *See* Def. Mem. at 14.[2] But Congress explicitly required pension funds in critical status to impose a contribution schedule, as annually "updated," and the result is neither "nonsensical" nor does it "dramatically" change federal labor law.

Under § 1085(e)(3)(C)(ii)'s express terms, the contribution schedule that a pension fund in critical status must impose on the bargaining parties is the schedule that was previously "applicable under the [parties'] expired collective bargaining agreement, as updated and in effect on the date the collective bargaining agreement expires." The reference to "upda[ting]" reflects § 1085(e)(3)(B)'s requirement that plan sponsors annually review and update the contribution schedules that are part of the rehabilitation plan. Thus, the contribution schedule that the pension fund is required to impose if the parties do not reach agreement within 180 days will be the same one that the parties previously adopted, changed only to the extent that it may have been updated in an annual review that occurred before the collective bargaining agreement expired.

In this case, the preferred schedule that the Employer and Local Union 6 had previously adopted had not been changed as a result of an annual review, and the terms that the Pension Fund imposed were identical to the terms that had been in effect under the expired collective bargaining agreement. But, even if such changes had been made, the statute explicitly provides that the bargaining parties would be bound by it.

---

[2] As an example of such a "fundamental change[ ]," the Employer posits that a pension fund in crticial status "could demand that the bargaining parties switch to an 'hours paid' contributions formula from an 'hours worked' contributions formula." *See* Def. Mem. at 14. One might reasonably question how "fundamental" such a change would be, but in any case, few employers would complain if a contribution obligation previously measured by "hours paid" (including vacation, holidays, etc.) were changed to an obligation measured only by "hours worked."

D.    The Employer's Other Assertions Respecting the Proper Interpretation
of the ERISA Provision on Which the Fund's ERISA Claim Rests

        In the last subsection of this portion of its responsive Memorandum addressed to the legal

validity of the Fund's ERISA claim, the Employer makes several additional assertions respecting

the proper interpretation of 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii).  *See* Def. Mem. at 14-17.  Each of

these assertions is baseless.

        1.    The Employer's first assertion is that its interpretation of

§ 1085(e)(3)(C)(ii)-(iii), under which the Employer is not a "'bargaining party' within the

meaning of" that provision, is preferable to the Fund's interpretation because it "allows the

statute to play an important role in pension fund recovery, without imposing the damage to labor

relations that Plaintiffs' interpretation inevitably presents."  *See* Def. Mem. at 14.  This assertion

is doubly flawed.

        First, as we have shown *supra* pp. 2-4, the Employer's interpretation of

§ 1085(e)(3)(C)(ii)-(iii) cannot be squared with the plain language of that provision, and the

Supreme Court has held time and again that where the language of a statute is plain, that is the

end of the matter.  *See e.g. Sullivan v. Stroop*, 496 U.S. 478, 482 (1990) (citing *K mart Corp. v.

Cartier, Inc.*, 486 U.S. 281, 291-92 (1988)).

        Second, far from "allow[ing] the statute to play an important role in pension fund

recovery," the Employer's interpretation, if accepted, would undermine the statute's self-evident

purpose.  According to the Employer, its interpretation would "significantly assist in

multiemployer pension plan funding" by requiring a participating employer to maintain its

existing level of contributions to the pension plan upon the expiration of its collective bargaining

agreement "while the bargaining parties work towards [a new] agreement."  *See* Def. Mem. at

15.  But this could not possibly have been Congress' purpose in enacting the statute, because as

the Employer itself acknowledges, *see* Def. Mem. at 6, a participating employer *already has a duty under federal labor law* to maintain its existing level of contributions to the pension plan upon the expiration of its collective bargaining agreement "while the bargaining parties work towards [a new] agreement." *See Advanced Lightweight*, *supra*, 484 U.S. at 543-44 nn.5-6.  In other words, under the Employer's interpretation of § 1085(e)(3)(C)(ii)-(iii), that provision would play no role at all, much less "an important role in pension fund recovery."

On its face, the statute's purpose is to strike a balance between the bargaining parties' interest in free collective bargaining and a critical-status multiemployer pension fund's interest in requiring participating employers to contribute to the pension fund under one of the contribution schedules established by the fund under a rehabilitation plan.  The statute strikes this balance by giving the bargaining parties 180 days after contract expiration to try to reach agreement upon a new contract "adopt[ing] a contribution schedule with terms consistent with" one of the contribution schedules established by the fund under a rehabilitation plan, but providing that if the parties are unable to reach a voluntary agreement along these lines within that time frame, "then the contribution schedule applicable under the expired [contract], as updated . . . *shall be implemented* by the plan sponsor." *See* 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) (emphasis added). The Fund's interpretation of § 1085(e)(3)(C)(ii)-(iii) accords with and gives full effect to this self-evident statutory purpose, whereas the opposite is true of the Employer's interpretation.

2.      The Employer's second assertion is that judicial adoption of its supposedly "textually faithful" interpretation of § 1085(e)(3)(C)(ii)-(iii) would  "avoid[ ] the harsh medicine" entailed by the conclusion that Congress intended in that provision to "repeal by implication 60 years of labor law."  Def. Mem. at 15.  This assertion is baseless.

To be sure, "[w]here possible, courts should attempt to harmonize statutory provisions and not go searching for implied repeals." *The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 341 (4th Cir. 2007). "Where," however, "reconciliation is *not* possible, courts have no choice but to give effect to the later enactment." *Id.* (emphasis added); *see also* Pl. Mem. at 15.[3]

Here, it simply is *not* possible to reconcile the "60 years of labor law" precedents invoked by the Employer with the explicit terms of Congress' 2014 enactment of § 1085(e)(3)(C)(ii)-(iii). For as we have shown, any such reconciliation would require this Court to adopt a proffered interpretation of § 1085(e)(3)(C)(ii)-(iii) that is not "faithful," Def. Mem. at 15, to the statutory text in the slightest. Accordingly, this Court has "no choice but to give effect to" § 1085(e)(3)(C)(ii)-(iii) *as written*, even if Congress in enacting that provision has administered "harsh medicine" to participating employers in critical-status multiemployer pension funds.[4]

        3.        The Employer's third assertion is that if Congress had intended "to fundamentally alter an employer's [federal labor law] rights on impasse" in the manner posited by the Fund, "one would expect to see pellucid statutory language and compelling legislative history" to that effect. *See* Def. Mem. at 16. The short answer to this assertion is that the statutory language at issue *is* "pellucid" on this point, and under the Supreme Court case law

---

[3] To be precise, we are not dealing in this case with an "implied repeal" of an earlier "statutory provision" by a later enactment, but rather a later enactment that forecloses the assertion of a right afforded by administrative and judicial interpretations of an earlier statutory provision (the NLRA). *See* Pl. Mem. at 14-15. However, because the Employer frames its argument here in terms of the presumption against finding an "implied repeal," *see* Def. Mem. at 15, we treat with this argument on the Employer's own terms and refute it as such.

[4] As noted in Pl. Mem. at 15 n.7, the Employer exaggerates the harshness of the "medicine" administered by Congress through its enactment of § 1085(e)(3)(C)(ii)-(iii), because that provision, on its face, has no effect whatsoever on a participating employer's pre-existing NLRA right to impose *non-pension-related* terms and conditions of employment on its union-represented employees upon reaching a bargaining impasse, including, for example, terms and conditions of employment pertaining to wages and health insurance benefits.

cited above, that is the end of the matter, obviating the need to look to other non-textual evidence

of congressional intent such as legislative history.[5]

       4.     Finally, the Employer asserts that its interpretation of § 1085(e)(3)(C)(ii)-

(iii) "is consistent with" the Second Circuit's decision in *Trustees of Local 138 Pension Fund v.*

*F.W. Honerkamp Co., Inc.*, 692 F.3d 127 (2d Cir. 2012).  In point of fact, however, the *F.W.*

*Honerkamp* decision does not bear on the matter at hand at all.

      The issue presented and decided in that case was whether the Pension Protection Act of

2006 could be read as foreclosing a participating employer in a critical-status multiemployer

pension fund from *withdrawing from participation* in the fund, subject to the payment of

withdrawal liability provided for by the Multiemployer Pension Plan Amendments Act of 1980.

In this case, however, the Employer does not seek to *withdraw from participation* in the Pension

Fund.  Quite to the contrary, the Employer wishes to continue its participation in the Pension

Fund, albeit only on behalf of *some* of its employees.  As we have shown, this is *not* something

that the Employer may lawfully do under § 1085(e)(3)(C)(ii)-(iii) and the Fund's rehabilitation

plan and longstanding rules, and there is nothing in the *F.W. Honerkamp* decision remotely to

suggest otherwise.

     *          *          *          *

      In sum, there is no merit in *any* of the potpourri of legal and factual assertions advanced

by the Employer in an effort to refute the Fund's showing that it has stated a valid ERISA claim

---

[5] In any event, we note that the 2014 amendments to the 2006 Pension Protection Act that
included § 1085(e)(3)(C)(ii)-(iii) came about through a last-minute addition to an omnibus
appropriations bill.  *See* 160 Cong. Rec. 6861-63 (daily ed. Dec. 15, 2014).  This fact likely
explains the thin legislative history.  We also note that the Fourth Circuit's decision in *The Last
Best Beef* case forecloses any argument that Congress cannot accomplish an "implied repeal"
through the vehicle of an appropriations bill.  *See* 506 F.3d at 338-40.

on the undisputed facts of record.  That being so, the Fund is entitled to judgment on the

pleadings unless the Employer, in its Answer, has interposed one or more "legally tenable"

defenses to the Fund's claim.  *See* Pl. Mem. at 8-9.  Without further ado, then, we turn to this

second issue.

## II.     THE EMPLOYER'S SECOND ARGUMENT IS FATALLY FLAWED

The Employer's second argument is that the Fund's motion for judgment on the

pleadings should be denied because it has pled two sets of legally sufficient affirmative defenses

to the Fund's claim.  *See* Def. Mem. at 17-30.  But none of the Employer's defenses has merit.

In its introduction to this second argument, the Employer makes the threshold assertion—

citing footnote 6 of the Fund's prior Memorandum at p. 13—that the Fund has "ask[ed] the

Court to apply" a legal standard for evaluating the legal sufficiency of its affirmative defenses

that differs from the normal "motion-to-strike standard."  *See* Def. Mem. at 17-18.  This

threshold assertion rests on a misreading of footnote 6.  Our sole point in that footnote is that a

motion for judgment on the pleadings is a more fitting *procedural mechanism* for attacking the

legal sufficiency of affirmative defenses than a motion to strike where, as here, the plaintiff's

position is that it has stated a valid claim for relief on the undisputed facts of record and that

none of the defendant's affirmative defenses is sufficient to defeat that claim for relief as a

matter of law.  Our prior Memorandum proceeds on the understanding, and we readily

acknowledge, that whichever *procedural mechanism* is used, the *legal standard* for evaluating

the legal sufficiency of affirmative defenses remains the same.[6]

Having clarified this threshold point, we now proceed to address the Employer's

assertion that it has pled two sets of legally sufficient affirmative defenses to the Fund's claim.

---

[6] Contrary to the Employer's assertion, in this Court at least, that legal standard encompasses the *Twombly-Iqbal* pleading standards.  *See infra* pp. 21-22.

A.      The Employer's First Set of Affirmative Defenses

In the first paragraph of that portion of its responsive Memorandum dealing with its first set of affirmative defenses (*i.e.*, defenses **first** through **fourth**), the Employer asserts that those defenses "are valid for the reasons stated at Section I above"; "reasons" that the Employer then proceeds to regurgitate in summary form in the three paragraphs that immediately follow.  *See* Def. Mem. at 18-19.   As shown *supra* pp. 2-13, *none* of these "reasons" stated by the Employer in Section I of its responsive Memorandum constitutes a "valid" answer or defense to the Fund's ERISA claim in this case.[7]

B.      The Employer's Second Set of Affirmative Defenses

In our prior Memorandum, we showed that the Employer's second set of affirmative defenses (*i.e.*, defenses **fifth** through **ninth**) are legally insufficient on two independent grounds. First, these defenses are not legally cognizable in an ERISA action brought to enforce a contribution obligation arising under 29 U.S.C. § 1085(e)(3)(C)(ii)-(iii) that, pursuant to § 1085(e)(3)(C)(iv), "shall be treated" as a contribution obligation arising under section 515 of ERISA,  29 U.S.C. § 1145.  *See* Pl. Mem. at 19-25.  Second, even if these defenses are legally cognizable, they fail because the Employer has not alleged facts that make them plausible under the applicable *Twombly-Iqbal* pleading standards.  *See id.* at 25-31.  The Employer challenges both showings in its responsive Memorandum, but neither challenge has any merit.

1.      The Legal Cognizability Issue

The Employer's response to our showing on the issue of the legal cognizability of its second set of affirmative defenses rests, at bottom, on the following bald assertion:  "Each of

---

[7]  Notably in this regard, in setting out these "reasons," the Employer does not even attempt to address the Seventh Circuit's decision in *Martin v. Garman Constr. Co.,* 945 F.2d 1000 (7th Cir. 1991), which, as explained in Pl. Mem. at 16-17, fully exposes the fallaciousness of the Employer's **third** and **fourth** affirmative defenses.

these Affirmative Defenses is based on *Plaintiffs' inequitable conduct* in obtaining a finding of

'critical status' where that finding was not warranted, not on the Union's conduct in the

collective bargaining process." *See* Def. Mem. at 21 (emphasis added).  But this assertion both

misapprehends the operation of the ERISA statutory scheme at issue in this case and

mischaracterizes the thrust of the Employer's second set of affirmative defenses.

Under the Pension Protection Act of 2006 ("PPA"), the governing body of a

multiemployer pension plan, here the Plaintiff Board of Trustees, is *not* responsible for

determining whether a critical status finding is "warranted."  Rather, the PPA assigns that

responsibility to *the plan actuary*.  *See* 29 U.S.C.  § 1085(b)(2) ("A multiemployer plan is in

critical status for a plan year if, *as determined by the plan actuary* under paragraph (3) below, the

plan is . . . .") (emphasis added); § 1085(b)(3)(A) ("Not later than the 90th day of each plan year

of a multiemployer plan, *the plan actuary* shall certify to the Secretary of the Treasury and to the

plan sponsor . . . whether or not the plan is or will be in critical status for such plan year . . . .")

(emphasis added).[8]

"[I]n making the determination[ ]" of "whether or not" the plan is in critical status, "*the*

*plan actuary* shall make projections required for the current and succeeding plan years of the

current value of the assets of the plan and the present value of all liabilities to participants and

beneficiaries under the plan for the current plan year as of the beginning of such year," and

"*[t]he actuary's* projections shall be based on reasonable *actuarial* estimates, assumptions, and

methods that . . . offer *the actuary's* best estimate of anticipated experience under the plan."  *See*

§ 1085(b)(3)(B)(i) (emphasis added).  To be sure, the plan's board of trustees has an independent

---

[8] As the Supreme Court has observed, "[f]or a variety of reasons, [a plan] actuary is not, like the
trustees, vulnerable to suggestions of bias or its appearance.  Although plan sponsors employ
them, actuaries are trained professionals subject to regulatory standards."  *See Concrete Pipe &*
*Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 632 (1993).

statutory duty under the PPA to provide the plan actuary with certain information bearing on the actuary's projection of industry activity, and to do so "reasonably and in good faith," *see* § 1085(b)(3)(B)(iii).  But by any lights, the party ultimately responsible under the PPA for evaluating and determining whether a critical status finding is "warranted" is *the plan actuary*.

Against this statutory backdrop, the undeniable thrust of the Employer's second set of affirmative defenses is that the Plaintiff Pension Fund's *actuary* violated *its* independent statutory duty under the PPA to base a critical status determination on a set of reasonable *actuarial* assumptions.  *See* Pl. Mem. at 18-19.  That being so, in our prior Memorandum, we framed the legal cognizability question presented here as whether, for ERISA section 515 purposes, "affirmative defenses resting on an allegation that a multiemployer pension plan actuary used improper assumptions in making a critical status certification . . . that . . . serves as a necessary predicate for increases in employer contribution rates to the pension plan . . . should be treated in the same fashion as affirmative defenses resting on an allegation of improper union conduct 'going to the formation of the collective bargaining agreement [giving rise to the employer's contribution obligations] such as fraud in the inducement.'"  *See id.* at 21-22.  The Employer's responsive Memorandum does nothing to undermine the showing in our prior Memorandum that this question should be answered in the affirmative.

As the Fourth Circuit explained in *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018 (4th Cir. 1997), the rule that affirmative defenses resting on an allegation of improper union conduct going to the formation of the collective bargaining agreement, such as fraud in the inducement, are *not* cognizable in an ERISA action brought to enforce section 515 furthers important policy goals that Congress intended to achieve in enacting section 515.  Specifically, a section 515 rule that "allow[s] multiemployer funds to

enforce the literal terms of an employer's [contractual] commitment [to contribute to the fund]," *even where that contractual commitment would not have arisen but for a union's alleged fraud or other improper conduct*, "increases the reliability of the[ ] [funds'] income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements," thereby serving section 515's intended purposes.  *See id.* at 1021-22.

By a parity of reasoning, this Court should hold—in resolving what concededly is an issue of first impression—that affirmative defenses resting on an allegation that a plan actuary has violated its independent statutory duty under the PPA to base a critical status determination on a set of reasonable actuarial assumptions are *not* cognizable in an ERISA action brought to enforce section 515.  To paraphrase the Fourth Circuit's decision in *Ralph's Grocery* by applying it to the situation at hand, a section 515 rule that would "allow[ ] multiemployer funds to enforce the literal terms of an employer's [statutory obligation under the PPA to contribute to the fund under a contribution schedule established under a rehabilitation plan]," *even where that statutory obligation would not have arisen but for the plan actuary's allegedly improper critical status determination*, would "increase[ ] the reliability of the[ ] [funds'] income streams, reduce[ ] the cost and delay associated with collection actions, and reduce[ ] or eliminate[ ] the cost of monitoring [a plan actuary's fulfillment of its independent statutory duties]," thereby serving section 515's intended purposes.

Indeed, for the reasons set out in Pl. Mem. at 22-23, the case for barring affirmative defenses resting on an allegation that a plan actuary has violated its statutory duty under the PPA to base a critical status determination on a set of reasonable actuarial assumptions *is even stronger* that the case for barring affirmative defenses resting on an allegation of improper union

conduct going to the formation of a collective bargaining agreement such as fraud in the
inducement.  By way of summary, that is so because:  (a) in enacting the PPA Congress gave
participating employers the right to challenge certain specific statutory violations, while *omitting*
from its list of challengeable statutory violations a plan actuary's violation of its statutory duty to
base a critical status determination on a set of reasonable actuarial assumptions; and (b) given the
comprehensiveness of the PPA, that congressional omission must be taken as "deliberate[ ]"
rather than "inadvertent" under a line of Supreme Court case law that includes *Massachusetts
Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 146 (1985) and *Northwest Airlines v.
Transport Workers Union*, 451 U.S. 77, 97 (1981).[9]

      In its responsive Memorandum, the Employer attempts to slough off these considerations
unique to the PPA as "unpersuasive musings," *see* Def. Mem. at 23, adverting to "numerous
cases" in which lower federal courts have deemed it appropriate to create "federal common-law"
remedies in favor of an ERISA plaintiff or defendant notwithstanding the comprehensiveness of
ERISA, *see id.* at 24-25.  Tellingly, however, the only such *Fourth Circuit* case cited by the
Employer, *Provident Life & Accident Insurance Co. v. Waller*, 906 F.2d 985 (4th Cir. 1990), has
been confined to facts far afield from those here and all but overruled in *Provident Life &
Accident Insurance Co. v. Cohen*, 423 F.3d 413 (4th Cir. 2005).  *See id.* at 424-26, explaining
that the panel opinion in *Waller* is at odds with the "rule of constraint" established by the
Supreme Court in *Russell* and its progeny, under which "courts may not create remedies under
the federal common law beyond those Congress has seen fit to enact," but declining to overrule
*Waller* "[b]ecause one panel may not overrule another panel."  Under this "rule of constraint,"

---

[9] Notably, *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 54 (1987), cited by the Employer
itself in Def. Mem. at 23-24, reaffirms and applies these principles set out in *Russell* and
*Northwest Airlines*.

this Court should refuse to recognize "federal common-law" affirmative defenses to an ERISA action to enforce an employer's contribution obligations under the PPA insofar as those defenses rest on the allegation that a plan actuary has violated its statutory duty under the PPA to base a critical status determination on a set of reasonable actuarial assumptions; defenses that Congress did not "see[ ] fit to enact" in the comprehensive PPA itself.

To be sure, as noted in *Dairy v. Dairy Employees Union Local No. 17*, 153 F. Supp. 3d 1217 (E.D. Cal. 2015), *appeal docketed*, No. 16-15107 (9th Cir. Jan. 25, 2016), discussed in Pl. Mem. at 23, this "rule of constraint" does not completely foreclose judicial recognition of "federal common-law" affirmative defenses where the failure to recognize such defenses would leave an "awkward gap in the statutory scheme" that Congress could not possibly have intended. But this exception to the "rule of constraint" plainly does not apply here, for as we showed in Pl. Mem. at 24 *without contradiction by the Employer in its responsive Memorandum*, ERISA affords the Secretary of Labor the power to sue for redress of any improper conduct engaged in by a pension plan actuary which violates the actuary's statutory duties under the PPA.

In a last-ditch effort to avoid this conclusion, the Employer asserts that the Fund's arguments "based on the express rights of action under ERISA Section 502(a) . . . fail for the simple reason Just Born has not brought a 'civil action,'" but rather "raises affirmative defenses in response to the Fund's action." *See* Def. Mem. at 24. This difference is immaterial. In enacting the PPA, Congress undoubtedly was keenly aware of the financial implications for employers of a plan actuary's critical status determination, which serves as the necessary predicate for increases in employer contribution rates as well as the imposition of automatic surcharges on employers. *See* Pl. Mem. at 22. Yet in the PPA, Congress made *no* provision for employer challenges to the validity of a plan actuary's critical status determination, *either* by

giving employers a right of action to block contribution rate increases and surcharges made possible by an allegedly invalid critical status determination, *or* by giving employers the right to assert affirmative defenses to an action brought against them to collect those contribution rate increases and surcharges.  Given the comprehensive of the PPA, that congressional omission in *both* respects must be taken as "deliberate[ ]" rather than "inadvertent."

This conclusion is buttressed by the fact that when Congress has wanted to give employers the right to assert certain affirmative defenses to a multiemployer pension plan collection action—*including specifically* defenses challenging the reasonableness of actuarial assumptions made by the plan actuary—Congress has done so explicitly in the statute itself. Thus, in enacting the Multiemployer Pension Plan Amendments Act of 1980, Congress "provide[d] for certain enumerated defenses to" a plan's assessment of withdrawal liability against a withdrawing employer, *see Dairy*, *supra*, 153 F. Supp. 3d at 1246, one of which is the defense that "the actuarial assumptions and methods used in the [plan's withdrawal liability] determination were, in the aggregate, unreasonable," *see* 29 U.S.C. § 1401(a)(3)(B).

Although the undeniable thrust of the Employer's second set of affirmative defenses is that the Fund's actuary violated its statutory duty under the PPA to base a critical status determination on a set of reasonable actuarial assumptions, the Employer's Answer also alleges in support of these defenses (or so it appears) that the Plaintiff Board of Trustees violated *its* statutory duty under the PPA to "act reasonably and in good faith" in providing industry activity information to the plan actuary.  *See* Pl. Mem. at 29.  This raises a separate question as to the legal cognizability of affirmative defenses resting on such an allegation respecting the Plaintiff Trustees' own conduct.

In support of a finding that affirmative defenses resting on such an allegation respecting the Plaintiff Trustees' own conduct are legally cognizable, the Employer cites a number of cases from other jurisdictions holding that ERISA section 515 does not bar the assertion by employers of affirmative defenses resting on a plaintiff pension fund's own "misconduct."  *See* Def. Mem. at 20-21.  However, even assuming *arguendo* that the Fourth Circuit would embrace the holding of these cases, *but see Ralph's Grocery*, *supra*, 118 F.3d at 1027 (reserving the question, still open in the Fourth Circuit, of "whether equitable estoppel, when premised on the misconduct of a multiemployer fund, is available as a defense to an action for delinquent pension contributions"), these cases do not support the Employer's position here.  That is so because the alleged Trustee "misconduct" in *this* case, unlike the alleged pension fund "misconduct" in the Employer's relied-upon cases, involves the alleged violation by the Trustees of a statutory duty arising under a comprehensive statutory scheme (the PPA) that makes no provision for employer challenges to such violations.  Under the "rule of constraint," *Cohen*, *supra*, 423 F.3d at 425, discussed above and in Pl. Mem. at 25, that distinctive feature of *this* case makes all the difference.[10]

> 2.     The *Twombly-Iqbal* Issue

At the outset of its discussion of the separate, *Twombly-Iqbal* issue, the Employer notes that there is a split of authority among the federal district courts on whether the *Twombly-Iqbal* pleading standards apply to affirmative defenses, and tacitly invites this Court to overrule its prior three decisions, *see* Pl. Mem. at 12, holding that the *Twombly-Iqbal* pleading standards *do* apply to affirmative defenses.  *See* Def. Mem. at 25-26.  The Court should reject this invitation.

---

[10] In any event, the Employer does not even argue in its responsive Memorandum that its separate allegations respecting Trustee "misconduct" satisfy the applicable *Twombly-Iqbal* pleading standards.  *See infra* p. 24.

In each of the Court's prior three decisions on this issue, the Court took note of the split of authority among the federal district courts, and, after a lengthy analysis, opted to follow what it correctly characterized as the "majority" rule.  The most recent of these decisions was issued by the Court in June of 2014, *see Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 461-62 (D. Md. 2014), and the Employer cites no subsequent developments in the law, such as an intervening Fourth Circuit decision or amendment to the federal rules, that dictates a reversal of course here.

"Regardless," says the Employer, "Just Born's Affirmative Defenses state a plausible entitlement to relief, as required by the *Iqbal-Twombly* standard."  *See* Def. Mem. at 26.  Nothing could be further from the truth.

In seeking to back up its position on this issue, the Employer begins by asserting that it has adequately pled that the Pension Fund "fraudulent[ly] . . . misrepresent[ed]" the material fact that "the Fund was in critical status."  *See* Def. Mem. at 27; *see also id.* at 29.  Not so.  The only fact alleged in either pleading on this point is the notice that the Fund sent to all participating employers on November 14, 2012, which is attached to Plaintiffs' Complaint as Exhibit B.  In that notice, the Fund did not make a simple declaratory statement that it "was in critical status," as the Employer would have it.  Rather, the Fund's notice stated that the Fund "*was certified by its actuary to be in* 'critical status.'"  *See* Compl., Exh. B, at 1 (emphasis added).  This statement that the Fund "*was certified by its actuary to be in* critical status" was a true statement, as the Employer's Answer admits.  *See* Compl. ¶ 15; Answer ¶ 15.  It was *not* a "misrepresentation."

This unfounded inflammatory charge that the Fund committed an act of "fraud" against all participating employers by proceeding as it did in this matter—and thus has "unclean hands" and would be "unjustly enrich[ed]" by a judgment in its favor here, *see* Def. Mem. at 29-30— cannot obscure the undeniable reality that, at bottom, the Employer's second set of affirmative

defenses rests on the allegation that the Fund's actuary violated its statutory duty under the PPA to base its critical status determination on a set of reasonable actuarial assumptions.  The fatal problem for the Employer, from a *Twombly-Iqbal* standpoint, is that its responsive pleading does not set out *a single fact* that, if proven, would substantiate this allegation respecting the actuary's conduct.  *See* Pl. Mem. at 25-31.

In contending otherwise, the Employer does not dispute our showing in Pl. Mem. at 26-27 that the test under the PPA is whether the plan actuary's critical status determination was based on *objectively reasonable* actuarial assumptions.  But according to the Employer, "Plaintiffs' principal rejoinder" to its allegations respecting the actuarial assumptions underlying the plan actuary's critical status determination is that those assumptions "were objectively reasonable," which "[t]he Court cannot assume without evidence, as Plaintiffs would have it do." *See* Def. Mem. at 27.  This is yet another mischaracterization of the Fund's position in this case. The Fund most certainly has *not* asked the Court to "assume without evidence," or otherwise find, that the actuarial assumptions underlying the plan actuary's critical status determination "were objectively reasonable."  Rather, the Fund has asked the Court to find that the Employer has failed adequately to plead that those assumptions were objectively *un*reasonable.

The Employer goes on to argue that it has adequately pled facts showing that the plan actuary failed in its statutory duty to "take 'proper account of the various factors'" bearing on its evaluation of the Pension Fund's financial health.  *See* Def. Mem. at 28 (quoting Pl. Mem. at 27). Again, not so.  In this regard, the Employer points to the allegations in its Answer that the plan actuary's decision in 2012 to change certain of its past actuarial assumptions was not based on "sound actuarial principles," but rather stemmed from "an ulterior purpose."  But on their face, these are mere conclusory allegations of improper conduct by the actuary, and not *facts* backing

up those allegations—much less *facts* showing that the actuary did not take "proper account" of any "factors" relevant to its evaluation of the Pension Fund's financial health.  Indeed, one searches the Employer's Answer in vain for any allegation of what "factors" the plan actuary purportedly failed to take "proper account" of.

This fully disposes of the Employer's responsive arguments with respect to the showing in our prior Memorandum that the Employer has failed adequately to plead a violation of the plan actuary's statutory duty under the PPA to base its critical status determination on a set of reasonable actuarial assumptions.  And, tellingly, the Employer offers no response at all to the separate showing in our prior Memorandum that the Employer has failed adequately to plead a violation of the Plaintiff Trustees' statutory duty under the PPA to "act reasonably and in good faith" in providing industry activity information to the actuary.  *See* Pl. Mem. at 29-30.   In sum, then, our showing that the Employer's second set of affirmative defenses fails as a matter of law on independent, *Twombly-Iqbal* grounds stands wholly unrefuted.

To tie up a loose end, the Employer seeks leave to amend in the event that the Court finds that its second set of affirmative defenses is legally cognizable but insufficiently pled.  *See* Def. Mem. at 26.  Although these affirmative defenses do not have any factual basis that the Employer could allege in an amended pleading consistent with Rule 11, we do not oppose this Employer request for leave to amend as framed.  But of course, if the Court should conclude that the Employer's second set of affirmative defenses is *not* legally cognizable, then leave to amend should be denied as futile.  *Compare United States v. Pittman*, 209 F.3d 314 (4th Cir. 2000).

## CONCLUSION

For the foregoing reasons, and those set out in our prior Memorandum, the Fund's motion for judgment on the pleadings should be granted, and the Employer's cross-motion for judgment on the pleadings should be denied.

Respectfully submitted,

/s/ Andrew D. Roth_____
Julia Penny Clark (Bar No. 12401)
Andrew D. Roth (Bar No. 19601)
BREDHOFF & KAISER, P.L.L.C.
805 15th Street, N.W.
Washington, D.C. 20005
(202) 842-2600

Counsel for Plaintiffs

Dated:  August 29, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2016, a true and correct copy of the foregoing

Memorandum in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings, and in

Reply in Support of Plaintiffs' Motion for Judgment on the Pleadings on Liability, was

electronically filed using the CM/ECF system, which will send notification to the following:


Elizabeth Anne Scully
David A. Rivkin
Jay P. Krupin
Mark Wendell Delaquil
Baker and Hostetler LLP
1050 Connecticut Ave. NW Ste. 1100
Washington, DC 20036

/s/ Andrew D. Roth
Andrew D. Roth