IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BAKERY AND CONFECTIONERY UNION     :
AND INDUSTRIAL INTERNATIONAL
PENSION FUND, et al.               :

     v.                            :     Civil Action No. DKC 16-0793

                          :

JUST BORN II, INC.                 :

                          :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract case are: (1) a motion for judgment on the pleadings filed by Plaintiffs Bakery and Confectionery Union and Industrial International Pension Fund (the "Fund") and the trustees of the Fund (the "Trustees") (ECF No. 24); and (2) a cross-motion for judgment on the pleadings by Defendant Just Born II, Inc. ("Defendant") (ECF No. 25). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion will be granted in part and denied in part, and Defendant's cross-motion will be denied.

## I.    Factual Background[1]

Plaintiffs are a trust fund established and maintained pursuant to 29 U.S.C § 186(c)(5), and the Trustees who administer it (together, "Plaintiffs"). (ECF No. 1 ¶¶ 4 & 5).

---

[1] Unless otherwise noted, the facts outlined here are undisputed and set forth in the complaint.

The Fund provides retirement benefits to eligible employees of participating employers and qualifies under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, as both an employee benefit plan, *see id.* § 1002(2), (3), and a multiemployer pension plan, *see id.* § 1002(37). (ECF No. 1 ¶ 4). Defendant is a candy manufacturer that was a party to a series of collective bargaining agreements with the Bakery, Confectionery and Tobacco Workers International Union, Local Union 6 (the "Union"). (*Id.* ¶ 10). The most recent collective bargaining agreement (the "CBA") between Defendant and the Union was effective from March 1, 2012, through February 28, 2015. (*Id.*). Article 22 of the CBA stated that contributions:

> shall be paid [to Plaintiff] from the first day the employee begins working in a job classification covered by the [CBA], and shall be paid on behalf of all employees in covered job classifications – there are no exceptions for employees who are not members of the Union, temporary, seasonal, or part-time employees, for leased employees, or for any other type of employee.

(ECF No. 1-2, at 17).

In 2012, during the term of the CBA, the Fund's actuary certified that the Fund was in "critical" status. (ECF No. 1 ¶ 15). Under ERISA, multiemployer plans can be certified as being in "endangered" or "critical" status based on the present and projected value of the plan, its projected costs and benefits payable, and other potential funding deficiencies. *See* 29

2

U.S.C. § 1085(b).   When a plan is in critical status, ERISA requires the plan sponsor to "adopt and implement a rehabilitation plan" designed to improve the fund's fiscal health.  *Id.* § 1085(a)(2), (e).   The Trustees developed a rehabilitation plan with revised benefit and contribution schedules and proposed two revised options to the Union and Defendant.  (ECF Nos. 1 ¶ 16; 1-3).   On December 28, 2012, the Union and Defendant selected one of the revised schedules and signed a "PPA Schedule Election Form."  (ECF Nos. 1 ¶ 17; 1-4). The revised schedule proposal and the PPA Schedule Election Form both included language similar to the CBA that bound Defendant to make payments for all work done by employees in a job classification covered by the CBA.  (*See* ECF Nos. 1-3, at 7; 1-4, at 2-3).

When the CBA expired on February 28, 2015, Defendant and the Union agreed to a short-term extension of the CBA until April 30, 2015, and the two sides began bargaining for a new agreement.  (ECF Nos. 1 ¶ 18; 1-5).   During negotiations, Defendant demanded that any new agreement relieve it from the obligation to make contributions to the Fund on behalf of newly hired employees.  (ECF No. 1 ¶ 19).   In its cross-motion, Defendant explains that it had developed serious concerns about the management of the Fund and that it no longer believed that participation in the Fund was in its employees' best interest.

(ECF No. 25-1, at 11).   The Union refused to accept Defendant's terms, and, eventually, Defendant declared that negotiations were at an impasse.  (ECF No. 1 ¶ 20).   Under federal labor law, when an impasse in bargaining is reached in good faith, bargaining can be suspended and the employer can make unilateral changes, so long as the terms it applies are not substantially different from those terms it last proposed in negotiations. *See McClatchy Newspapers, Inc.*, 321 NLRB 1386, 1996 WL 506086, at *6 (2000).  Defendant thus unilaterally implemented its "best offer," under which it would continue to contribute to the Fund on behalf of then-current employees and would contribute to an unrelated 401(k) retirement plan on behalf of subsequently hired employees.   (ECF No. 1 ¶ 20).    Defendant has not made contributions to the Fund for newly hired employees since declaring impasse and implementing its best offer.  (*Id.* ¶ 22).

## II.  Procedural Background

On March 17, 2016, Plaintiffs filed the instant suit under 29 U.S.C. § 1145, which gives a multiemployer plan the right to sue an employer for delinquent contributions.  Plaintiffs allege that Defendant's failure to make payments to the Fund on behalf of new employees is a breach of its obligation under 29 U.S.C. § 1085(e)(3)(C)(ii) (the "Provision").  The Provision was passed as part of the Pension Protection Act ("PPA"), which amended ERISA law to give multiemployer pension funds that are at risk

of failing authority to make the changes necessary to prevent insolvency.   The Provision mandates that, even after a collective bargaining agreement expires, a plan sponsor like the Trustees must impose the contribution schedule previously in place under that agreement when certain criteria are met.   In full it states:

> If--
>
> (I) a collective bargaining agreement providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan (or imposed under subparagraph (C)(i)) expires while the plan is still in critical status, and
>
> (II) after receiving one or more updated schedules from the plan sponsor under subparagraph (B)(ii), the bargaining parties with respect to such agreement fail to adopt a contribution schedule with terms consistent with the updated rehabilitation plan and a schedule from the plan sponsor,
>
> then the contribution schedule applicable under the expired collective bargaining agreement, as updated and in effect on the date the collective bargaining agreement expires, shall be implemented by the plan sponsor beginning on the date specified in clause (iii) [180 days after the date on which the collective bargaining agreement expires].

*Id*.   The primary dispute in this case derives from the parties' interpretations of the Provision.   Defendant also raised nine affirmative defenses in its answer.   (ECF No. 9-1, at 15-16). Plaintiffs filed the pending motion for judgment on the

pleadings on June 24, 2016.  (ECF No. 24).  Defendant filed a cross-motion for judgment on the pleadings in its favor on August 15.  (ECF No. 25).  Plaintiffs responded to that motion, and Defendant replied.  (ECF Nos. 26; 27).

## III. Standard of Review

Fed.R.Civ.P. 12(c) provides: "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  The standard for resolving a motion pursuant to Rule 12(c) depends on the nature of the relief being sought.  In some situations, the standard for a Rule 12(c) motion on the pleadings is identical to the standard for summary judgment motions.  5C Charles Alan Wright & Arthur R. Miller, et al., Federal Practice & Procedure § 1369 (3$^d$ ed. 2004) ("Both the summary judgment procedure and the motion for judgment on the pleadings are concerned with the substance of the parties' claims and defenses and are directed towards a final judgment on the merits.").  "[The summary judgment] rubric is . . . appropriate where the moving party seeks affirmative relief on the basis of the pleadings and not merely a dismissal of claims brought against it." *Geoghegan v. Grant*, No. DKC-10-1137, 2011 WL 673779, at *3 (D.Md. Feb. 17, 2011).  A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a).  The

key distinction between a Rule 12(c) motion and a Rule 56 motion is that the court may not consider facts outside the pleadings under Rule 12(c). *Geoghegan*, 2011 WL 673779, at *3.

## IV. Interpreting the Provision

Plaintiffs contend that, in line with the text of the Provision: (1) Defendant and the Union were "bargaining parties" with respect to "a collective bargaining agreement providing for contributions" to the Fund "in accordance with a schedule provided" pursuant to a rehabilitation plan; (2) the extension of that collective bargaining agreement expired on April 30, 2015; (3) at that time, the Fund remained in critical status; and (4) those two bargaining parties "fail[ed] to adopt a contribution schedule with terms consistent" with the rehabilitation plan and a schedule from the Trustees. (ECF No. 24-1, at 11-13). Under Plaintiffs' reading, the Trustees were thus required to implement the schedule from the expired CBA 180 days after the CBA expired. Because the schedule from the expired CBA included the language requiring Defendant to pay "from the first day [an] employee begins working" for "all employees in covered job classifications," Plaintiffs maintain that the Fund is entitled to contributions from Defendant for new employees. Defendant contends that the Provision does not apply to it in the present circumstances because it is not a "bargaining party" as that term is defined in the Provision or

because it reached a bargaining impasse in good faith and has a labor law right to implement the terms of its last, best offer unilaterally.

   **A.   Bargaining Parties**

As noted above, the Provision applies when a collective bargaining agreement expires and "the bargaining parties with respect to such agreement fail to adopt a contribution schedule." Defendant's first counterargument is that it does not qualify as a "bargaining party" under the Provision. According to the definitions under § 1085, a "bargaining party" is either an employee organization, like the Union, or "an employer who has an obligation to contribute under the plan." *Id.* § 1085(j)(1). In turn, an "obligation to contribute" is defined by reference to § 1392, which states that "the term 'obligation to contribute' means an obligation to contribute arising--(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law . . . ." *Id.* § 1392(a). According to Defendant, it no longer has an obligation to contribute arising under a collective bargaining agreement "because there is no collective bargaining agreement in force." (ECF No. 25-1, at 16). Therefore, Defendant maintains, it no longer qualifies as a bargaining party under the Provision. (*Id.* at 14). Plaintiffs respond that the Provision refers to

8

"the bargaining parties *with respect to* such agreement," "such agreement" being the expired collective bargaining agreement. (ECF No. 26, at 7).  Defendant was quite clearly a bargaining party to the expired CBA, as it had an obligation to contribute to the plan under that agreement.

Defendant responds to this argument in two ways.  First, Defendant argues that this reading makes the word "bargaining" in the term "bargaining parties" superfluous because it refers to all parties with respect to the earlier agreement.  (ECF No. 27, at 9).  To the contrary, there may well be other parties to an expired collective bargaining agreement that do not qualify as bargaining parties as defined in § 1085(j)(1).  Second, it argues that the phrase "with respect to" modifies the term "bargaining parties," and therefore it would be "grammatically impossible" for the phrase to do anything but narrow the scope of the term by specifying a subset of "bargaining parties." (*Id.* at 10-11).  This argument fails because it ignores the temporal element inherent in the reference.  Defendant does not and could not suggest that it was never a bargaining party. Rather, it contends that it ceased to be a bargaining party when its obligation to contribute expired with the CBA.  Even if that is true and Defendant is no longer a bargaining party, however, it still was a bargaining party with respect to the expired CBA. Hence, it is actually Defendant's reading that would read words

out of the Provision, applying it only to "bargaining parties" that *remain* "bargaining parties" without regard for the fact that the phrase "with respect to such agreement" necessarily includes *former* bargaining parties whose obligation to contribute has expired.  Those former "bargaining parties with respect to" the expired CBA are indeed a subset of all "bargaining parties," and they are the subset identified in the Provision.  Therefore, Defendant is a bargaining party in this context.

**B.   Applicability of the Provision After Impasse**

Defendant also argues that applying the Provision after it reached an impasse would "repeal by implication" the long-standing federal labor law right to implement its last, best offer after reaching an impasse in good faith.  It points most helpfully to *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127 (2[d] Cir. 2012), in which the United States Court of Appeals for the Second Circuit reviewed § 1085(e)(3)(C)(i), a statute that parallels the Provision and effects essentially the same mandatory implementation of a contribution schedule on bargaining parties whose plan entered critical status during the term of a collective bargaining agreement.  Section 1085(e)(3)(C)(i) differs from the Provision only in that it applies to bargaining parties whose agreement

expires *before* they receive or adopt a new contribution schedule under the rehabilitation plan.[2]

In *Honerkamp*, the fund's actuaries certified its critical status in March 2008, and it presented the employer with several new schedules under a rehabilitation plan in November. *Id.* at 132. Before the bargaining parties adopted one of these schedules, the collective bargaining agreement that was in place expired in February of 2009. *Id.* The employer and the union began negotiating for a new agreement but reached an impasse in summer 2009. *Id.* at 132-33. Under the labor law rights described above, the employer unilaterally implemented its final offer, which, rather than accepting any of the schedules the fund had offered, withdrew entirely from the fund and created 401(k) retirement plans for its employees – similar to what Defendant here has done for new employees. *Id.* at 133. The plan challenged whether the employer had the right to withdraw from the fund, given that the language of § 1085(e)(3)(C)(i) mandated that the fund implement a "default" schedule if the bargaining parties to the expired collective bargaining agreement did not agree to one of the proposed schedules from the fund. *Id.*

---

[2] At the time *Honerkamp* was decided, the provision in question was located at 29 U.S.C. § 1085(e)(1). When Congress amended this section of the code in 2014, the same provision was moved without substantive change to § 1085(e)(3)(C)(i). For simplicity, it is referred to as § 1085(e)(3)(C)(i) in this opinion.

The Second Circuit observed that § 1085(e)(3)(C)(i) had been enacted in 2006 as part of the PPA, which, as noted above, was intended to protect pension funds that were at risk of becoming insolvent. *Id.* at 130. The court emphasized, however, that the PPA was added as a complement to preexisting sections of ERISA that were passed under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which forced an employer that withdrew from a pension plan to pay its share of the pension plan's unfunded liability. *Id.* That the PPA was meant to complement the MPPAA was clear because, among other things, provisions in the PPA revised the calculation of the withdrawal penalty where the pension plan withdrawn from was in critical status. *Id.* at 134. Because "both statutes aim to protect beneficiaries of multiemployer pension plans by keeping such plans adequately funded," the court said, "it was not necessary for Congress to forbid withdrawal, [which would be] accompanied by MPPAA liability." *Id.* at 135. Thus, the court held that the employer was allowed to withdraw from the fund as part of the implementation of its final offer, provided it was paying the withdrawal penalty. *Id.*

Defendant argues that the Second Circuit's decision confirms that Congress did not intend to abrogate an employer's rights to implement the terms of its best offer – whatever they may be – after an impasse is reached in good faith. (ECF No.

25-1, at 22). Because the court affirmed an employer's collective bargaining rights in the face of the § 1085(e)(3)(C)(i) mandate – which, again, matches the Provision's mandate – Defendant asks "why an employer would have the right to withdraw from contribution obligations under a pension fund, notwithstanding [§ 1085(e)(3)(C)(i)], but would somehow be bound to affirmatively assume obligations that never existed on behalf of [new] employees." (ECF No. 27, at 16).

*Honerkamp* provides an answer to this question. There, the court affirmed a scheme in which a fund in critical status could protect its interests and advance toward solvency by forcing employers either to stay in the fund and contribute to its rehabilitation under the PPA, or to withdraw from the fund and pay the withdrawal penalty under the MPPAA. *Honerkamp*, 692 F.3d at 135. By upholding the employer's right to withdraw, then, the Second Circuit was protecting the employer's negotiating rights, while acknowledging that the employer would have to pay into the fund, either on the PPA's terms, by way of one of the proposed rehabilitation schedules, or the MPPAA's terms, by way of the withdrawal penalty. This dichotomy is especially apparent because, as noted above, the PPA defines the employers to which it is applicable by reference to an "obligation to contribute" as defined in § 1392, the exact section of the MPPAA that defines what triggers the withdrawal penalty. *See* 29

U.S.C. § 1383(a) ("[A] complete withdrawal from a multiemployer plan occurs when an employer . . . permanently ceases to have an *obligation to contribute* under the plan.").

Defendant seems to be trying to walk the line between these two sections of ERISA, avoiding the contributions required under Plaintiffs' rehabilitation plan schedules while simultaneously avoiding MPPAA withdrawal liability by removing itself from the Fund by attrition, making each new hire an effective withdrawal without acknowledging withdrawal in a way that would trigger the withdrawal penalty. *See* 29 U.S.C. §§ 1381-1385. Allowing an employer to avoid both payments would run contrary to the aim of the two statutes "to protect beneficiaries of multiemployer pension plans by keeping such plans adequately funded." *Honerkamp*, 692 F.3d at 135. Although Defendant suggests that paying into the Fund for new employees would be "assum[ing] obligations that never existed," the terms of the schedule that mandated payment for all employees in a job classification clearly did create an obligation to contribute for new employees in those classifications under the expired CBA and the revised schedules. In creating the rehabilitation plan and contribution schedules, the Trustees undoubtedly took into account the number of employees for which employers would be paying into the Fund, something that Defendant seeks to change by avoiding the terms of the schedules that Plaintiffs proposed. This type of

14

withdrawal without compensation would put plans at risk of the "vicious downward spiral" in which "withdrawals reduce a plan's contribution base . . . [pushing] the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, [and] [t]he rising costs may encourage – or force – further withdrawals." *Id.* at 129 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n.2 (1984) (quoting *Pension Plan Termination Insurance Issues: Hearings before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 95th Cong., 2[d] Sess., 22 (1978))).

To be sure, these provisions impose on an employer's labor law rights.  An employer must either adopt one of the schedules proposed by the fund, which has no obligation to take input from contributing employers, or it must withdraw and pay a penalty.  But just as an employer must pay a withdrawal penalty if that withdrawal comes after impasse, *see Honerkamp*, 692 F.3d at 133-136, so too must a fund impose a schedule on a non-withdrawing employer after impasse.  The Provision does not distinguish between parties that "adopt a contribution schedule" as part of a new collective bargaining agreement and those that might adopt such a schedule outside of one.  What mattered to Congress when it enacted the PPA is that an at-risk fund gets the contributions it needs to be rehabilitated.  Moreover, the PPA mandates imposition of rehabilitation plan schedules even if

both the employer and the union object to a schedule and agree to different terms. Nothing in the Provision indicates that this imposition requirement should be retracted in situations where, as here, the plan is imposing a schedule over the objection of the employer alone. Defendant bemoans being "bound to affirmatively assume obligations that never existed" (ECF No. 27, at 16), but such an imposition is clearly what Congress intended when it passed the PPA and titled the subsection containing the Provision "*Imposition* of a schedule where failure to adopt a rehabilitation plan." As Plaintiffs point out, Defendant's contention that the Provision was designed merely to enforce the prior schedule during extended negotiations would be no imposition at all because labor law already requires the extension of expired terms during pending negotiations. (ECF No. 26, at 13-14). Therefore, Plaintiffs' reading of the Provision is correct. Plaintiffs' motion will be granted in part, and they are entitled to judgment in their favor unless Defendant's affirmative defenses preclude recovery.

## V.   Affirmative Defenses

### A.   Permissibility of Affirmative Defenses Under 29 U.S.C. § 1145

In its answer, Defendant raised nine affirmative defenses. Plaintiffs first contend that courts have rejected the use of affirmative defenses in actions brought under 29 U.S.C. § 1145, which was enacted "to promote prompt payment of contributions"

16

and "[to] permit . . . plans to recover delinquent contributions efficaciously." (ECF No. 24-1, at 26 (citing *S. Comm. on Labor & Human Res.*, 96th Cong., 2[d] Sess., 43-44 (1980))). Although Plaintiffs admit that the issue that prompted the passage of § 1145 was that pension plans were being dragged into contract disputes between employers and unions, they argue that the court should treat affirmative defenses similarly here for a variety of reasons. (ECF No. 24-1, at 27). First, Plaintiffs argue that allowing affirmative defenses to be raised in this context would permit any employer to resist making payments to a fund by challenging the actuarial assumptions underlying a plan's critical status. (*Id.* at 28). Second, they contend that Congress gave employers only two explicit causes of action under the PPA and neither is valid here. (*Id.*). Third, they contend that only the Secretary of Labor may challenge the certification of a critical status because, absent an express cause of action allowing an employer to bring challenges like the ones Defendant brings here, Congress must have intended to leave such actions to the Secretary of Labor's sweeping powers to sue for ERISA violations. (*Id.* at 30).

Defendant points to *Kaiser Steel Corp v. Mullins*, 455 U.S. 72 (1982), which held that, although § 1145 was enacted to "simplify delinquency collection," *id.* at 87, the goal was to minimize "lengthy, costly and complex litigation concerning

17

claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions," *id.* (emphasis in original).[3]   Congress "did not say that employers should be prevented from raising all defenses; rather they spoke in terms of 'unrelated' and 'extraneous' defenses." *Id.* at 88. Defendant cites several other cases that support this conclusion in contexts similar to this case.   (ECF No. 25-1, at 25-26); *see also Bd. of Trs. of Watsonville Frozen Food Welfare Tr. Fund v. Cal. Coop. Creamery*, 877 F.2d 1415, 1425 (9th Cir. 1989) (holding that an employer could raise the affirmative defense of conflict of interest because the defense "goes directly to the Trust Fund's actions in imposing [a fee on an employer] and thus is related directly to [the employer's] obligation to pay and the Trust Fund's entitlement to [payment]"); *Laborers' Pension Fund v. Litgen Concrete Cutting & Coring Co.*, 128 F.R.D. 96, 98 n.2 (N.D.Ill. 1989) (recognizing that an employer may raise affirmative defenses related to "the actions of the Fund itself in asserting its rights," including, *inter alia*, defenses of fraud and misrepresentation).[4]   Plaintiffs do not address *Kaiser Steel* in their response, nor do they refute that Defendant has cited several cases in which federal courts have supported

---

[3]   *Kaiser Steel* dealt with the predecessor to § 1145, § 306(a), but it contained the exact same language.   *Compare Kaiser Steel*, 455 U.S. at 86, *with* 29 U.S.C. § 1145.
[4]   Defendant also argues that it is asserting affirmative defenses, not claims, so Plaintiffs' arguments related to causes of actions should not apply.

Defendant's position that "federal common law" can be appropriate in spite of the comprehensive scheme of ERISA law and the Secretary's broad powers under that law.    Because Defendant is challenging "the plan[']s[] entitlement to the contributions," the rule that Plaintiffs reference is inapplicable, and the argument that Defendant may not raise affirmative defenses fails.

###   B.    Pleadings Standard

The parties next dispute whether Plaintiffs' rebuttals to Defendant's affirmative defenses are properly considered part of the Rule 12(c) motion for judgment on the pleadings.    Defendant contends that the normal vehicle for rebutting an affirmative defense is through a motion to strike under Fed.R.Civ.P. 12(f). (ECF No. 25-1, at 22).    Plaintiffs suggest that, although their arguments could be construed as a series of motions to strike, such motions are "more fitting . . . where a plaintiff challenges only some of the defenses raised in a defendant's pleading." *Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 335 (D.Md. 2012) (citing Wright & Miller, *supra*, § 1367); *see also* Wright & Miller, *supra*, § 1369 (noting that Rule 12(f) "serves as a pruning device to eliminate objectionable matter from an opponent's pleadings and, unlike the Rule 12(c) procedure, it is not directed at gaining a final judgment on the merits").    This dispute is largely academic.

> Federal Rule 12(c) should be read in
> conjunction with several other federal rules
> authorizing pretrial motions, especially the
> various Rule 12(b) motions to dismiss, the
> Rule 12(f) motion to strike, and the Rule 56
> motion for summary judgment. Collectively,
> these procedures provide an arsenal of
> weapons for challenging the sufficiency of
> an opponent's pleading and the viability of
> the underlying claim or defense.

Wright & Miller, *supra*, § 1369. "The standard for resolving a

motion pursuant to Rule 12(c) depends on the nature of the

relief being sought." *Geoghegan*, 2011 WL 673779, at *4.

Depending on the context, "the district court will apply the

same standards for granting the appropriate relief or denying

the motion as it would have employed had the motion been brought

prior to the defendant's answer under Rules 12(b)(1), (6), or

(7) or under Rule 12(f)." Wright & Miller, *supra*, § 1367.

Plaintiffs assert that Defendant "has not alleged facts

that make [its affirmative defenses] plausible under the

applicable *Twombly-Iqbal* standards." (ECF No. 24-1, at 31).

Defendant argues, in response, that courts within this district,

this circuit, and nationwide are split as to whether the

pleading standards in *Twombly* and *Iqbal* apply to affirmative

defenses and that the "better interpretation of the Federal

Rules of Civil Procedure is that the *Iqbal-Twombly* standard does

not apply." (ECF No. 25-1, at 30). Defendant is correct that

neither *Twombly* nor *Iqbal* expressly addressed the pleading

requirements applicable to affirmative defenses, and district

courts throughout the country have since debated the issue. This court, however, has expressly adopted the majority view that affirmative defenses must meet those standards. *See Long v. Welch & Rushe, Inc.*, 28 F.Supp.3d 446, 461–62 (D.Md. 2014). Therefore, affirmative defenses must be sufficiently pleaded to "ensure that an opposing party receives fair notice of the factual basis for an assertion contained in a [ ] defense." *Bradshaw v. Hilco Receivables, LLC*, 725 F.Supp.2d 532, 536 (D.Md. 2010). This pleading standard requires that, "at a minimum, some statement of the ultimate facts underlying the defense must be set forth, and both its non-conclusory factual content and the reasonable inferences from that content, must plausibly suggest a cognizable defense available to the defendant." *Haley Paint*, 279 F.R.D. at 336.[5]

### C. Defendant's Pleadings

The first four affirmative defenses are easily rejected. Defendant's first two defenses are that (1) Plaintiffs have failed to state a claim upon which relief can be granted; and (2) that Defendant was within its rights to implement the terms of its best offer after the expiration of the CBA and reaching impasse in new negotiations. These defenses speak to the merits

---

[5] Although Defendant may have intended for its own cross-motion for judgment on the pleadings to rest on its statutory interpretation arguments described above, its pending cross-motion further counsels in favor of holding it to a higher pleading standard.

of the case and fail for the reasons stated above.  Defendant's third and fourth affirmative defenses, that the NLRB dismissal of the Union's unfair labor practice charge precludes review in this court and that jurisdiction over this dispute belongs in the exclusive jurisdiction of the NLRB, also fail.  Although Defendant is correct that federal district courts lack jurisdiction to make determinations under § 1392(a)(2), *see Laborers Health & Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 549 (1988), these jurisdictional defenses apply only to Defendant's arguments that it does not qualify as a "bargaining party" under § 1392(a)(2) because of an obligation to contribute "under labor-management relations law."  (ECF No. 25-1, at 16).  Because Plaintiffs' theory of liability is based on Defendant being a bargaining party by way of its obligation to contribute arising under the expired CBA as defined in § 1392(a)(1), these defenses are immaterial to the present motions.

Defendant's remaining defenses pertain to the validity of the Fund's certified critical status.  Defendant contends that, after losing a legal dispute over the benefits the Fund owed to certain beneficiaries, the Fund's actuary "falsely and fraudulently" revised its actuarial assumptions in order to certify the Fund as being in critical status, thereby allowing the Fund to reduce benefits as part of a rehabilitation plan.

22

(ECF No. 9-1 ¶¶ 34-43).   The crux of its argument is that the Fund's critical status never should have been certified.   In its final five affirmative defenses, Defendant contends that (1) Plaintiffs fraudulently induced it into agreeing to the revised schedule in the PPA Schedule Election Form; (2) Plaintiffs' rights asserted in this case are the result of fraud or material misrepresentations; (3) granting Plaintiffs recovery in this suit would unjustly enrich them; (4) Plaintiffs have unclean hands and cannot recover equitable relief sought; and (5) the critical status certification, and the ensuing rehabilitation plan and contribution schedules are legally defective and unlawfully imposed.   (*Id.* at 16).

Each of these defenses is dependent on Plaintiffs having fraudulently or intentionally misrepresented the Fund being in critical status as "required []or authorized by ERISA." (*See* ECF No. 9-1 ¶ 46).[6]   Defendant makes much of its allegations that the Fund's actuary "manipulated actuarial assumptions" and "depart[ed] from past practice" to certify the Fund's critical status (ECF No. 9-1 ¶ 28), which, it contends, would not have occurred had prior actuarial assumptions been used (ECF No. 25-1, at 32).   But § 1085 generally requires only that "projections

---

[6] Defendant also claims that Plaintiffs failed to provide sufficient notice to plan beneficiaries according to governing statutory requirements (ECF No. 9-1 ¶ 50), but it has alleged no facts related to this accusation.   To the degree that issues of notice are embedded in Defendant's affirmative defenses, they have not been sufficiently pleaded here.

shall be based on reasonable actuarial estimates, assumptions, and methods that . . . offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1085(b)(3)(B)(i). "Reasonableness is a zone, not a point." *Artistic Carton Co. v. Paper Indus. Union Mgmt. Pension Fund*, 971 F.2d 1346, 1351 (7th Cir. 1992). When Congress provided that funds must rely on reasonable actuarial methods, it did so with the understanding that funds seeking to improve their solvency may make generous assumptions. *Id.* at 1348-49; *see also Combs v. Classic Coal Corp.*, 931 F.2d 96, 99-100 (D.C.Cir. 1991) (noting that "[g]reat differences of opinion exist as to actuarial methods" and finding that Congress recognized that the "range of reasonableness permits the actuary wide latitude"). Therefore, the Fund's actuary was entitled to make adjustments in making its determinations and projections. For Defendant to show that the need for a rehabilitation plan was fraudulent and "neither required nor authorized by ERISA" (ECF No. 9-1 ¶ 46), it must attack the reasonableness of the actuary's assumptions, not the alteration of the assumptions or the motivations behind the alterations.

Moreover, it is well-established that a party alleging fraud must do so with particularity, regardless of whether the allegation is made by way of a claim or an affirmative defense. *Aguilar v. City Lights of China Rest., Inc.*, No. DKC 11-2416,

2011 WL 5118325, at *4 (D.Md. Oct. 24, 2011); Fed.R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). While "intent, knowledge, and other conditions of a person's mind may be alleged generally" under Fed.R.Civ.P. 9(b), a party alleging fraud must plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citations omitted).

Here, Defendant has not sufficiently pleaded its fifth through ninth affirmative defenses. Defendant does argue that the actuary did not take proper account of the various factors that one would expect a reasonable actuary to consider. (ECF No. 25-1, at 33). In its answer, Defendant identified six ways that the Fund's actuary allegedly departed from "sound actuarial principles" in evaluating the financial health of the Fund. (ECF No. 9-1 ¶¶ 38-41).[7] Based on the pleadings, however, it is unclear whether Defendant is accusing the actuary of fraud by way of its certification or accusing the Trustees on the theory that they fraudulently induced Defendant to agree to a

---

[7] Defendant has provided fairly limited detail to support its contention that the specific changes it identifies were unreasonable, and Plaintiffs have already attempted to show why each of these assumptions were reasonable (ECF No. 24-1, at 34-36).

contribution schedule under the rehabilitation plan when *they* knew that the critical status was not based on reasonable actuarial assumptions.   Defendant variously refers to the actions taken by the actuary, the Fund, or the Trustees.   It must plead clearly who allegedly knew what when making what assertions.  Defendant will have to amend its affirmative defenses to state with more particularity the circumstances of the alleged misrepresentation.

## VI.  Conclusion

For the foregoing reasons, the motion for judgment on the pleadings will be granted in part and denied in part, and the cross-motion will be denied.   A separate order will follow.


                                 /s/
                               DEBORAH K. CHASANOW
                               United States District Judge